[Cite as *State v. Elliott*, 2024-Ohio-3376.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 22AP-532 |
| v. | : | (C.P.C. No. 20CR-1717) |
| William A. Elliott, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 3, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Taylor M. Mick*, for appellee. **Argued:** *Taylor M. Mick.*

**On brief:** *Carpenter Lipp LLP*, *Kort Gatterdam,* and *Erik P. Henry*, for appellant. **Argued:** *Kort Gatterdam.*

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, William A. Elliott, appeals a judgment of the Franklin County Court of Common Pleas that convicted and sentenced Elliott for aggravated murder, aggravated burglary, kidnapping, and tampering with evidence. For the following reasons, we affirm that judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} At 23 years old, Maria Best died from 44 knife wounds while lying on her bedroom floor. Before her death, Best struggled with both developmental disabilities and bipolar disorder. According to her mother, Best had presented two different versions of herself. She was often complacent and "kind of shut down and just agree[d] to everything you said." (June 15, 2022 Tr. Vol. V at 413.) Alternatively, Best could become agitated and unresponsive to logic.

{¶ 3}   Best's mother explained that "making friends, having friends, dating, finding somebody that she could bond with" was very important to Best. *Id.* at 412.  Best "always treated people as if they had good intentions," and she was generous and giving with her friends. *Id.* at 411.  Best met Michael Bledsoe, her first and only boyfriend, in a homeless shelter.  Best's mother described Bledsoe as "somebody who also struggles just to exist." *Id.* at 416.  Best's mother stated that neither Best nor Bledsoe "had the skill set to really navigate a relationship all that well.  And their approach to it was basically to be completely inseparable.  But they both struggled for certain things, like resources, money, housing, food.  And so the two of them together, they were kind of like fish trapped in a bowl that's too small." *Id.* at 414.

{¶ 4}   Best could not retain a job because she lacked basic skills like counting money.  However, Best received Social Security Disability Income because of her mental disability.  This income allowed Best independence, but Best encountered difficulties living independently from her family because, as her mother explained, "in general, she didn't have the ability to gauge her environment.  She had no real understanding of danger." *Id.* at 418.

{¶ 5}   With the assistance of a non-profit organization, Best rented and moved into apartment C at 1422 Phale D. Hale Drive in early March 2020.  Best allowed her boyfriend, Bledsoe, as well as two friends, Elliott and his girlfriend, Crystal Adams, to stay at her new apartment.  Best and her roommates soon met and befriended their next-door neighbor, Jeremy Tracy, who lived in apartment B.

### A.  The Events of March 11, 2020

{¶ 6}  On the evening of March 11, 2020, Tracy drove Best, Bledsoe, Elliott, and Adams to Clean Rite Center, a laundromat in Whitehall.  Best laundered her clothes but did not fold them.  Elliott became angry over Best's failure to fold her clothes, and he and Best began arguing.  While waiting for the others to finish their laundry, Best and Elliott returned to Tracy's car.  Best and Elliott continued their argument as they sat in the car, with Best in the backseat and Elliott in the driver's seat.  A video recording of the laundromat parking lot shows Elliott exit the car, walk to the rear passenger side door, open it, reach in the passenger compartment, and yank at something or someone.  The recording then jumps ahead by a minute, preventing the viewer from seeing what happened next.

But, as Best later explained to police officers, Elliott "pulled [her] out of the car by [her] hair and [her] arms and threw [her] to the ground." (Pl.'s Ex. H2, Officer Schwartz Body-worn camera.)

{¶ 7}   By the time police responded to a disturbance call at the laundromat, Elliott had left on foot. After unsuccessfully trying to find Elliott at the laundromat, Officer Luke Schwartz, a Whitehall police officer, spoke to Elliott by cellphone. Officer Schwartz asked Elliott to return to the laundromat so Officer Schwartz could talk to him about what had just happened. Elliott agreed to come back to the laundromat and said he would arrive in about five minutes. Elliott never reappeared at the laundromat.

{¶ 8}   Best told Officer Schwartz that she wanted to file charges against Elliott. However, Best later changed her mind, telling Officer Schwartz that she "just would like to go home and forget about it." *Id.* Officer Schwartz then spoke with Elliott by cellphone again and informed him that Best was not pursuing charges. Elliott denied assaulting Best. Officer Schwartz warned Elliott that, "if you did it, you gotta knock that s*** off." *Id.*

{¶ 9}   Tracy, Best, Bledsoe, and Adams left the laundromat in Tracy's car. Tracy stopped two or three minutes from the laundromat to pick up Elliott. The group then returned to 1422 Phale D. Hale Drive.

{¶ 10}   Back at apartment C, Best went into the bedroom. Elliott told the others that he had to use the bathroom, which could only be accessed through the bedroom. After Elliott went into the bedroom, Bledsoe heard "[a] thump, like * * * a very loud noise," and the "next thing [he] kn[e]w there was a hole in the wall." (June 16, 2022 Tr. Vol. VI at 856.) In a later conversation with police, Best confirmed that Elliott had "shoved [her] into the wall in [her] bedroom." (Pl.'s Ex. B, Officer Wolfe body-worn camera.) Best sustained a bruise on the left side of her forehead from hitting the wall. Photographs of Best's bedroom wall show cracks and gaps in the drywall creating a round depression underneath the window.

## B. The Events of March 12 and 13, 2020

{¶ 11}   The next day, March 12, 2020, Tracy joined the four roommates for dinner in apartment C. According to Tracy, Elliott became angry that Best was not eating the dinner Adams had cooked.

{¶ 12} Later that night, Tracy, Elliott, and Bledsoe traveled to West Broad Street to pick up Elliott's friend, Nicole White, and bring her back to 1422 Phale D. Hale Drive. Elliott explained to White that he was aggravated with Best, and he wanted White to talk with Best about "[h]ygiene and folding her clothes and making a room presentable for people to walk through." (June 21, 2022 Tr. Vol. VII at 1064.) According to White, hygiene and order mattered to Elliott "[b]ecause [he] has OCD, everything has a place and somewhere to go. And if it doesn't, then it doesn't belong there." *Id.*

{¶ 13} When White told Best she needed to straighten her belongings, Best initially complied. White helped Best fold her clothes and put them away in her dresser. While they worked, White allowed Best to listen to music on White's cellphone. According to White, Elliott and Adams had taken Best's two cellphones away from her due to the ongoing argument between Elliott and Best. Tracy and Bledsoe also recalled that Elliott had confiscated Best's cellphones and had them in his possession on the night of March 12.

{¶ 14} Eventually, Best became frustrated with cleaning up her bedroom. She wanted her cellphones back and everyone out of her apartment. Best left the apartment and began walking toward Ohio State East Hospital ("OSU Hospital"). Elliott and White followed Best on foot. While walking behind Best, Elliott called 911 on a cellphone and told the 911 operator that his roommate, who he was following, had tried to commit suicide. Elliott said that his roommate had tried to cut herself, but he had taken the knife from her. He explained that he was following his roommate so she did not hurt herself by running into traffic. The 911 operator told Elliott the police would respond.

{¶ 15} Columbus police officers located Best near OSU Hospital. Best immediately asked the officers "to get these people out of my house." (Pl.'s Ex. B, Officer Wolfe body-worn camera.) In response to Officer Trevor Wolfe's questions about her reported suicide attempt, Best denied trying to hurt herself, and she showed the officers that she had no cuts on her wrists. Best told the officers that her roommates had claimed she was suicidal because they wanted to keep staying at her apartment. Best recounted how Elliott assaulted her at the laundromat and how he later shoved her into her bedroom wall. She showed the officers the bruise on her forehead. Best said that she was trying to get to her mother's house. She explained that the people in her apartment had taken her cellphones from her and would not give them back. When the officers asked Best what they could do for her,

Best requested the officers get the people out of her apartment and make them return her cellphones. Best acknowledged that she was not supposed to permit anyone else to live in her apartment, but she had allowed Elliott and the others to stay because they were like family to her.

{¶ 16} The police officers transported Best back to 1422 Phale D. Hale Drive. At apartment C, the police officers announced that Bledsoe, Elliott, and Adams would have to pack their belongings and leave. Elliott became agitated and argued with the officers. When the officers insisted that he had to move out, Elliott grabbed his jacket and walked off. The officers then turned to Bledsoe and Adams and told them to gather their and Elliott's belongings. Best asked for her cellphones, and Adams threw them on the kitchen table.

{¶ 17} As Bledsoe, Adams, and White packed, Best unsuccessfully tried to contact her mother. Bledsoe, Adams, and White moved all the packed possessions onto the porch outside apartment C.

{¶ 18} After Bledsoe and Adams finished moving out, Best requested that Officer Wolfe file a report regarding the assault that occurred on March 11 when Elliott "forced [her] into the wall" and "was beating on [her]." (Pl.'s Ex. B, Officer Wolfe body-worn camera.) Best told Officer Wolfe that Elliott assaulted her because "he had told [her] to do something and [she] wasn't doing it cause they been bossing [her] around and telling [her] what to do in [her] own house." *Id*. Officer Wolfe took the report and gave Best a business card with a report number written on it.

{¶ 19} Officer Wolfe then asked Best if she would be okay that night. Best answered that she would, if the police removed Elliott and the others from the area. Officer Wolfe responded that the police could not do that, and he told Best to lock her door and not go outside.

{¶ 20} When Officer Wolfe left apartment C, Bledsoe, Adams, and White were standing on the porch outside of apartment C talking. Officer Wolfe told the trio not to contact Best. Adams said that they were just waiting for Tracy to return to his apartment.

{¶ 21} Upon Tracy's arrival back at 1422 Phale D. Hale Drive, he learned what had just transpired. Tracy agreed that Bledsoe, Adams, and Elliott could store their belongings

and stay at his apartment for a couple of days. Tracy, Bledsoe, Adams, and White moved everything from the porch into Tracy's apartment.

{¶ 22} Elliott then called Adams looking for a ride. Tracy agreed to pick Elliott up, and White went along as a passenger. When Tracy and White found Elliott, he was angry because he and Adams had nowhere else to live. According to White, during the car ride back to 1422 Phale D. Hale Drive, Elliott said "[t]hat we have to get rid of [Best]." (June 21, 2022 Tr. Vol. VII at 1073.) Tracy remembers Elliott saying that "he would take care of it" and "I'm going to kill her." (June 16, 2022 Tr. Vol. VI at 713.) *See also id.* at 760-61 ("At first [Elliott] said if [the situation] didn't get handled that he was going to take care of it. And then I believe something was said that made him even more upset, * * * which made him say that he was going to kill her.").

{¶ 23} Tracy and White agree that when Tracy, White, and Elliott returned to Tracy's apartment, the former roommates called Best and spoke to her by speaker. However, Tracy and White recall the phone conversation somewhat differently. According to Tracy, Elliott asked Best if she would drop the charges, and Best refused. Elliott got angry and said, "Okay, I'm going to handle it." *Id.* at 716. Adams then asked Best to drop the charges, and when Best again refused, Adams hung up. Elliott told Adams that she had 20 minutes to talk Best into dropping the charges. After 20 minutes, Elliott said again that he was going to handle it and asked Tracy for a screwdriver. Bledsoe asked Tracy for plastic gloves. Tracy gave Bledsoe the gloves, told Elliott where to look for a screwdriver, and went to bed.

{¶ 24} According to White's version of the cellphone call, Bledsoe tried to convince Best to allow them all to return to apartment C. Best told Bledsoe that he could come back, but the others could not. Elliott became angry when he heard that, and he and Bledsoe argued with Best for several minutes. White told them to stop arguing with Best; she was not going to let them into her apartment. White said that "if they [were] going to go do what they need[ed] to do[,] then they need[ed] to go do it." (June 21, 2022 Tr. Vol. VII at 1075.) At that point, Elliott grabbed a screwdriver and plastic gloves, Bledsoe grabbed plastic gloves, and they both headed to Best's apartment.

## C. Elliott and White Assault Best in her Apartment

{¶ 25} In Bledsoe's retelling of the events in apartment C, he, Elliott, and White entered Best's apartment by force because Best tried to barricade the door. Elliott first

punched Best in the face and gave her a bloody nose.  Elliott then told Best "to slit her own neck or he would do it for her." (June 16, 2022 Tr. Vol. VI at 871.)  When Best did not do as Elliott told her, Elliott tried to slit Best's neck himself.  Because Best was struggling to get away, White put her foot on Best's head to hold her in place.  Bledsoe saw Elliott stab Best in the kneecap, legs, and head, and finally, slit Best's throat.

{¶ 26} After the initial assault on Best, Elliott told Bledsoe to get Adams from apartment B.  Bledsoe and Adams returned together to apartment C.  They saw Elliott punch Best twice.  Adams said she could not be there and left.  According to Bledsoe, after that, Elliott continued to stab Best.

{¶ 27} The stress of seeing the attack on Best caused Bledsoe to start seizing.  White walked him back to apartment B, where he laid down in front of the air conditioner unit and fell asleep.  Later, he woke up when Elliott and White returned to apartment B.  He heard Elliott tell Adams that "the job [was] done." *Id.* at 880.  Bledsoe fell asleep once more.  He awoke when the police arrived, and he saw Elliott and White flee out the bedroom window of apartment B.

{¶ 28} According to White, after the cellphone call with Best, only Elliott and Bledsoe went to Best's apartment.  She and Adams stayed in apartment B until Bledsoe returned to get them.  When White and Adams arrived at apartment C, Best was lying on the kitchen floor and Elliott was sitting in a chair in front of her.  Elliott was yelling at Best that "it would have just been easier to just to let him come back." (June 21, 2022 Tr. Vol. VII at 1077.)  White handed Elliott a knife that had been lying on the kitchen counter.  Elliott put the knife in front of Best and told her to kill herself or he was going to kill her.  Best said that she was not going to kill herself.  Elliott then pulled Best's head up by her hair and cut her throat.  At this point, Adams left the apartment.

{¶ 29} White went to the bathroom.  When she came back to the kitchen, Elliott and Bledsoe were telling Best that "it would have just been easier to let them come back; they wouldn't have had to go through all of this." *Id.* at 1080.  A car passed by the apartment and Best started to yell.  In response, Elliott cut Best's throat again and stabbed her in the chest two or three times.  Bledsoe started shaking, announced he was going to have a seizure, and left Best's apartment to lie down in apartment B.  Shortly after that, White also left for apartment B to get cigarettes and a phone charger.

{¶ 30} When White returned to apartment C, she started looking for rags and cleaning supplies to clean up the blood. Elliott was aggravated because Best was not dying quickly enough. He kept drinking and yelling at White about Best's failure to die, asking White if Best was possessed.

{¶ 31} Elliott then visited apartment B for about a half hour. While he was gone, Best asked White if she was sorry for what she and Elliott were doing. White told her no, and to shut up and stop talking. Best attempted to crawl toward the front door, so White kicked her in the head multiple times.

{¶ 32} When Elliott returned to apartment C, he stabbed Best in her back, buttocks, and leg. He also stabbed her in the back of her head and the top of her head, which caused the knife to bend. In total, White saw Elliott slit Best's throat three times and stab her several times.

{¶ 33} White began cleaning the blood on the floor, walls, and cabinets of the kitchen. Elliott asked White "to hand him something that he could put inside of [Best]." (June 21, 2022 Tr. Vol. VII at 1089.) White handed Elliott a spaghetti ladle and continued cleaning. She did not watch Elliott use the spaghetti ladle. Elliott later handed the spaghetti ladle back to White, and White washed it off.

{¶ 34} Around 5:00 or 5:30 a.m., Bledsoe messaged White to warn her that people were starting to go to work, so she and Elliott needed to leave apartment C. White alerted Elliott. She got a garbage bag and put into it bloody rags, the plastic gloves she had been wearing, Best's bloody clothes, and cigarette butts. White left apartment C out of the bedroom window. When she left, Best was lying on the living room floor. Best was alive because White saw her blink her eyes.

{¶ 35} After leaving apartment C, White went to apartment B and changed her clothes. Elliott arrived at apartment B approximately 20 to 30 minutes later. Elliott told White that he exited apartment C through the bedroom window, just like White had. He also said to White that "we have to finish it tomorrow." *Id.* at 1097. White understood this to mean that they would have to get rid of Best's body and finish cleaning apartment C the next day.

{¶ 36} Elliott fell asleep on the couch. White remained awake, and she began talking with Adams. Tracy woke up and left the apartment. After a while, White and Adams went

outside to smoke cigarettes. White noticed a bloody glove on the ground outside of Best's apartment. She picked it up and put it in her pocket. A police officer pulled up in a cruiser and told White and Adams he was there to do a wellness check. When White and Adams told him they were fine, the officer left. White and Adams went back inside apartment B. Soon thereafter, White and Adams heard the police outside again. They awoke Elliott, and White and Elliott escaped out the bedroom window of apartment B.

### D. Tracy's Version of Events

{¶ 37} Although Tracy did not see or participate in the violence in apartment C, he was not totally ignorant about it. Sometime before dawn on March 13, he woke up to walk his dog. While Tracy was searching for his dog's leash in his living room, Elliott appeared at the front door of apartment B. Elliott had "a bloody knife and bloody gloves on," and he asked Tracy where Bledsoe was. (June 16, 2022 Tr. Vol. VI at 766.) When Tracy said that he did not know, Elliott left. Tracy went back to his bedroom.

{¶ 38} Very early the next morning, Tracy was outside of the apartment building walking his dog when Elliott exited apartment C. After Tracy returned to his apartment, Tracy heard Elliott and White enter the apartment and White say that she needed to change her clothes and shoes. White also said that she "[did]n't think [she] could ever sleep again." *Id.* at 774.

{¶ 39} Tracy then drove his brother to a morning appointment. While driving back to 1422 Phale D. Hale Drive, the brothers discussed what Tracy had seen and heard the previous night and that morning. They decided that Tracy's brother would assess the situation by looking through Best's bedroom window. Upon seeing Best's half-dressed corpse lying on the bedroom floor, Tracy's brother told Tracy to call 911. Tracy's 911 call prompted the police response that caused Elliott and White to flee.

### E. The Charges and White's Plea

{¶ 40} The Columbus police arrested Elliott and White in relation to Best's murder. Elliott was indicted for: (1) aggravated burglary, a first degree felony in violation of R.C. 2911.11, (2) kidnapping, a first degree felony in violation of R.C. 2905.01, (3) aggravated murder, an unspecified felony in violation of R.C. 2903.01(A), (4) aggravated murder, an unspecified felony in violation of R.C. 2903.01(B), (5) murder, an unspecified felony in violation of R.C. 2903.02(A), (6) murder, an unspecified felony in violation of R.C.

2903.02(B), and (7) tampering with evidence, a third degree felony in violation of R.C. 2921.12. All counts other than the last count included a repeat violent offender ("RVO") specification pursuant to R.C. 2941.149(A). White was indicted for the same offenses, but her indictment did not include any RVO specifications.

{¶ 41} Prior to Elliott's trial, White agreed to plead guilty and testify truthfully against Elliott. White agreed to enter a guilty plea to Count 1, aggravated burglary; Count 2, kidnapping; a lesser-included offense of Count 6, involuntary manslaughter; and Count 7, tampering with evidence. The state of Ohio agreed to recommend the trial court enter a nolle prosequi for Count 3, aggravated murder; Count 4, aggravated murder; and Count 5, murder. The state also agreed to recommend the trial court sentence White to an indefinite sentence of 20 to 25.5 years' imprisonment.

### F. Trial Testimony and Evidence

{¶ 42} At Elliott's trial, White, Bledsoe, and Tracy testified to the facts set forth above. The trial court admitted into evidence video recordings from Clean Rite Center from the night of March 11, the body-worn camera of Officer Schwartz from the night of March 11, and the body-worn camera of Officer Wolfe from the night of March 12. The trial court also admitted the audio recordings of Elliott's and Tracy's 911 calls.

{¶ 43} Additionally, the trial evidence included video recordings the Columbus police collected from a surveillance camera located at OSU Hospital that captured the front doors of the apartments at 1422 Phale D. Hale Drive. Due to the distance between the camera and 1422 Phale D. Hale Drive, the recordings could not provide enough detail to allow the viewer to discern the identities of the individuals shown on the recordings. However, the recordings showed that at 3:15 a.m. on March 13, two individuals exited apartment B and entered apartment C. Approximately 15 minutes later, at 3:32 a.m., three individuals left apartment B and went into apartment C. At 5:22 a.m., someone wearing a light-colored t-shirt left apartment C and walked into the backyard of 1422 Phale D. Hale Drive. Approximately five minutes later, at 5:27 a.m., someone wearing a light-colored t-shirt appeared from between the two houses immediately to the west of 1422 Phale D. Hale Drive, walked east down Phale D. Hale Drive, and entered apartment C. At approximately 6:44 a.m., an individual wearing dark clothes walked east down Phale D. Hale Drive and

entered apartment B. Finally, at approximately 7:05 a.m., an individual wearing a light-colored t-shirt walked east down Phale D. Hale Drive and entered apartment B.

{¶ 44} In addition to the recordings, Kari Gee, who was working as a medical laboratory scientist at OSU Hospital on March 13, testified. Gee took a cigarette break at 4:30 a.m. at a location where she could see the front doors of apartments B and C. She saw a black male exit apartment C, go into apartment B for approximately 30 seconds to one minute, and then reenter apartment C. Approximately 30 seconds after Gee saw the black male reenter apartment C, she heard a woman screaming for "30 to 45 seconds, starting and stopping as she caught her breath." (Juen 16, 2022 Tr. Vol. VI at 673.) According to Gee, the black male she saw was wearing coveralls and possibly a black beanie.

{¶ 45} The state also introduced physical evidence from the crime scene. The Columbus Police Department's crime scene search unit processed apartments B and C, as well as the surrounding area. In a trash can in the backyard of 1422 Phale D. Hale Drive, the crime scene search unit officers discovered a paring knife covered in blood. The knife blade was slightly bent. White identified this knife as the knife Elliott used to stab Best. DNA analysis of the blood on the knife blade found DNA consistent with Best.

{¶ 46} In a different trash can in the backyard of 1422 Phale D. Hale Drive, the crime scene search unit officers found a plastic glove. That glove was identical to other gloves contained in a box of gloves located in apartment B. DNA analysis of a swab from the outside of that glove detected a DNA mixture consistent with Best and Elliott.

### G. The Testimony of Dr. Daniels, Deputy Coroner

{¶ 47} Finally, the state called as a witness Dr. John A. Daniels, a deputy coroner for the Franklin County Coroner's Office, who conducted the autopsy of Best. Dr. Daniels determined that Best's cause of death was "[m]ultiple sharp force injuries of the head, neck, chest and abdomen." (June 21, 2022 Tr. Vol. VI at 803.) Best sustained 44 sharp force injuries, but four of those wounds were more serious than the others. The first of these serious wounds was to the left side of Best's upper chest. This wound occurred when a cutting instrument passed through Best's ribs and entered the main pulmonary artery. Dr. Daniels estimated that Best could have died from this wound in two minutes or less.

{¶ 48} Best also sustained potentially lethal wounds to her central chest and her left anterior chest through her upper left breast. In the case of the wound to Best's central chest,

the cutting instrument entered the left pleural cavity. In the case of the wound to Best's anterior chest, the cutting instrument penetrated the upper lobe of Best's left lung.

{¶ 49} Finally, Best received a potentially lethal wound on the left side of her chest. There, the cutting instrument entered the left lobe of Best's liver. However, because the wound did not bleed much, Dr. Daniels opined that Best had already sustained significant blood loss before sustaining this wound.

{¶ 50} Best also had five cut wounds stretching across her neck that penetrated to a depth of one-quarter inch. Dr. Daniels explained that, due to the shallowness of these cuts, they did not interfere with Best's ability to breathe or sever any arteries, although they bled profusely and caused Best significant pain. Best also had several bruises, which Dr. Daniels found consistent with a prolonged death.

{¶ 51} Dr. Daniels also testified as follows:

> Q: Okay. Based on your findings, are you able to make a determination as to whether or not the wounds here were caused by more than one person?
>
> A: No.
>
> Q: Why not?
>
> A: There's nothing necessarily specific about any of these wounds that would identify a particular individual as having caused them. So I can point to any one of these stab wounds and I would not be able to say if one of them was caused by one individual or another -- another one was caused by a different individual. They're all stab wounds, they result in the use of a sharp force instrument, and that's as far as I can go.
>
> Q: Have you ever heard of the phrase, "Death by a thousand cuts?["]
>
> A: Yes, I have.
>
> Q: Does that apply possibly in this situation?
>
> A: It can, because all of these wounds are actively bleeding when they've been sustained. You know, individually or in small groups, these wounds may not be lethal, but if you have enough superficial wounds, the amount of blood loss occurring can be significant.

(June 16, 2022 Tr. Vol. VI at 821-22.)

{¶ 52} On cross-examination, Elliott's attorney initially focused on the depth of some of the deeper stab wounds Best sustained and the length a knife blade would have to be to cause wounds of that depth. Elliott's attorney and Dr. Daniels engaged in the following colloquy:

Q: You said the depth of some of these stab wounds reached as far as six-and-a-half inches deep?

A: Yes.

Q: Five-and-a-half inches deep?

A: Yes.

Q: What kind of blade would cause that type of depth of penetration?

A: Well, a knife blade.

Q: Okay.

A: You have to keep in mind that the body's surface is flexible.

Q: Okay.

A: So the depth of a knife wound can actually be slightly -- a small amount longer than the actual blade length itself.

Q: Okay. So what would you expect, though, in terms of the -- would you expect a certain blade length or maybe not at all? In other words, could I take a blade that was two inches and penetrate five-and-a-half?

A: I would say no.

Q: Three inches, five-and-a-half?

A: Four inches, four-and-a-half inches, five inches might do it.

* * *

Q: So if I had a blade that was, say, a half inch, could I have created a stab wound where the length of the wound from the subject is an inch-and-a-half? Are you saying I can pull it in and go like that?

A: Well, I'm not familiar with a study where they might say a blade of a given length to how much more you can penetrate the body depending on amount of force used.

Q: Okay.

A: It is a recognized part of forensic pathology, however, that you can have a stab wound that is deeper than the actual measured length of the blade.

   Obviously, there's a realm of possibility there and a realm of impossibility there. I don't think, in general, a two-inch blade in the chest where you have firm ribs could make a five-inch depth. But I cannot tell you exactly how long a blade would have to be to create a five-inch depth wound.

Q: Let me ask you this, Doctor. I mean, you've been doing this for -- you said since 1984?

A: 1986.

Q: 1986. Does all of these injuries seem to you, in your opinion, come from the same weapon?

A: I think it's consistent with the same weapon. However, if we have two similar knives, I could not distinguish between them.

Q: Okay. So one weapon could have caused each and every one of the wounds that you see?

A: There's nothing about any of these wounds that would make me think it wouldn't -- it couldn't be one weapon.

Q: And I think you indicated that the blade probably just -- it makes sense that if I have some small wounds, I can take a big blade and just stab a little bit like that, right?

A: Yes.

Q: But I need at least four inches to go that depth.

A:  That would be an estimate.

*Id.* at 833-36.

{¶ 53} On redirect, Dr. Daniels reconfirmed that an assailant could "make a wound track that is deeper than the actual blade length" by pushing hard on the flexible surfaces of the body.  *Id.* at 841.  On recross-examination, Elliott's counsel handed Dr. Daniels Ex. EE1, the knife White identified as the weapon Elliott used.  Elliott's counsel asked if Dr. Daniels saw the length of the blade.  Dr. Daniels answered, "Yes."  *Id.* at 845.  Elliott's counsel then asked Dr. Daniels if the handle of a knife that size would leave bruising if such a knife was used to penetrate five- and one-half inches.  Dr. Daniels answered, "It can.  It depends how much force was applied."  *Id.*  Elliott's counsel asked no further questions.

{¶ 54} The jury returned a verdict finding Elliott guilty on all counts.  The trial court subsequently found that the Elliott was a repeat violent offender.

### H.  Dr. Daniels' Post-Trial Email and Elliott's Motion for a New Trial

{¶ 55} The day before the sentencing hearing, the state provided Elliott's counsel with an email that the prosecutor had received from Dr. Daniels after the trial had ended. The email read:

> I was just wondering how the Maria Best trial was decided.  The presentation of the knife at trial was a bit of a surprise for me. I'm sure that there was a second knife that may not have been kept as evidence.  Just a suggestion for similar future cases, it would be useful to show a photo of the knife in question to the pathologist beforehand. That could avoid such 'demonstrations' in court.

(Court Ex. 1.)

{¶ 56} At the commencement of the sentencing hearing, Elliott's counsel orally moved for a new trial based on the email.  In support of this motion, Elliott's counsel argued:

> So, Judge, as part of my case in chief, our defense [was] there were allegations that we felt there were at least two knives used and that the testimony of the key witness in this case, Nikki White, could have been attacked in terms of credibility because of her testimony as to one knife.  And the problem is that the coroner is * * * sure that there was a second knife * * *.

> And, Judge, I think that that's very important because * * * the weapon that was used that was determined to be the weapon that caused the major damage in this case had to penetrate the victim at a five and a half, six and a half or seven inch into the heart. * * * [A]nd I wanted the coroner to say that that knife that they had, that the key witness, Nikki, said my client had[,] wasn't the murder weapon. But he * * * left [the jury] in doubt as to that, saying it was possible, et cetera, et cetera, when all the while he knew that there was a second knife with a longer blade. * * *
>
> So with that being in mind, Judge, I don't think that Mr. Elliott could get a fair trial with that type of doubt lingering and the jury deciding the case based on that.

(Aug. 9, 2022 Tr. Vol. XI at 5-6.)

{¶ 57} The trial court denied the defense motion for a new trial, finding "the fact there may have been a second knife involved really doesn't change the result that the jurors reached." *Id*. at 8.

### I. Sentence

{¶ 58} The trial court then turned to sentencing Elliott. The trial court merged Counts 3, 4, 5, and 6 for sentencing, and the state elected to have the trial court sentence Elliott on Count 3. The trial court sentenced Elliott to: (1) 11 to 16.5 years imprisonment as to Count 1, plus a mandatory consecutive five-year term as to the RVO specification; (2) 11 years imprisonment as to Count 2, plus a mandatory consecutive five-year term as to the RVO specification; (3) life imprisonment, without the possibility of parole, as to Count 3, plus a mandatory consecutive five-year term as to the RVO specification; and (4) three years imprisonment as to Count 7. The trial court ordered that Elliott serve Counts 1, 2, and 3 consecutively, for a total of a life sentence, plus 22 to 27.5 years imprisonment, plus an additional five-year consecutive term for the RVO specifications. On August 22, 2022, the trial court issued a judgment entry convicting Elliott and imposing the foregoing sentence.

## II. ASSIGNMENTS OF ERROR

{¶ 59} Elliott now appeals the August 22, 2022 judgment, and he assigns the following errors:

> [1.] THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR NEW TRIAL CONTRARY TO HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO

DUE PROCESS, CONFRONTATION, CROSS-EXAMINATION, AND TO PRESENT A DEFENSE.

[2.] THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE FROM THE CO-DEFENDANT'S POLYGRAPH EXAMINATIONS IN VIOLATION OF APPELLANT'S RIGHT TO CONFRONT THE WITNESSES AGAINST HIM.

[3.] THE PROSECUTION PRESENTED IMPROPER VICTIM-IMPACT EVIDENCE THAT INFLAMED THE JURY AND AFFECTED THE OUTCOME OF APPELLANT'S TRIAL CONTRARY TO APPELLANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

[4.] THE ADMISSION OF OTHER-ACTS TESTIMONY AND EVIDENCE VIOLATED EVIDENCE RULES 403 AND 404 AND APPELLANT'S RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL AS GUARARTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

[5.] APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

[6.] THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION BASED ON INSUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

[7.] THE TRIAL COURT ERRED IN NOT INQUIRING FURTHER WHEN APPELLANT REQUESTED NEW APPOINTED COUNSEL WHICH DEPRIVED APPELLANT OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL.

## III. LEGAL ANALYSIS

### A. First Assignment of Error–Motion for a New Trial

{¶ 60} By his first assignment of error, Elliott argues that the trial court erred in denying his motion for a new trial. We disagree.

{¶ 61} Elliott sought a new trial under Crim.R. 33(A)(6), which allows a trial court to grant a new trial "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." To obtain a new trial based on newly discovered evidence, a defendant must show:

> that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.

*State v. Petro*, 148 Ohio St. 505 (1947), syllabus.

{¶ 62} Here, the trial court premised its denial of Elliott's motion on the first *Petro* factor: the new evidence did not disclose a strong probability that it would change the result if the trial court granted a new trial. The first *Petro* factor requires a defendant to show a strong probability of a different result; a mere possibility of a different outcome is an insufficient basis on which to grant a motion for a new trial. *State v. Bressi*, 9th Dist. No. 29257, 2020-Ohio-4, ¶ 26. Moreover, "[w]here the effect of the newly discovered evidence is not to place sole responsibility for the crime on someone other than the defendant and to exonerate the defendant, the [evidence] does not disclose a strong probability that it will change the result if a new trial is granted." *State v. Phillips*, 10th Dist. No. 14AP-362, 2014-Ohio-4947, ¶ 17.

{¶ 63} Granting a motion for a new trial is an extraordinary measure that a court should use only when the evidence presented weighs heavily in favor of the defendant. *State v. Prater*, 10th Dist. No. 20AP-308, 2021-Ohio-3988, ¶ 20. A trial court's decision on a motion for a new trial based on newly discovered evidence is within the sound discretion of the court. *State v. Hawkins*, 66 Ohio St.3d 339, 350 (1993). Consequently, absent an abuse of that discretion, an appellate court will not reverse such a decision. *Id*.

{¶ 64} As we stated above, the newly discovered evidence was an email from Dr. Daniels that stated, in relevant part:

> The presentation of the knife at trial was a bit of a surprise for me. I'm sure that there was a second knife that may not have been kept as evidence. Just a suggestion for similar future cases, it would be useful to show a photo of the knife in question

to the pathologist beforehand. That could avoid such 'demonstrations' in court.

(Court Ex. 1.)

{¶ 65} To review the trial court's decision, we must give this email its reasonable interpretation. We construe it to mean: (1) Dr. Daniels was "surprise[d]" when he was handed Ex. EE1, the knife used in Best's murder, because he had not previously seen it; (2) he determined that "there was a second knife" that was used to stab Best, but that second knife was not in evidence; and (3) in the future, Dr. Daniels recommended that the prosecutor show coroners photographs of suspected murder weapons before their trial testimony. *Id.*

{¶ 66} Elliott begins his motion for a new trial by presuming Dr. Daniels determined there was a second knife because the knife in evidence had a blade that was too short to cause Best's deeper stab wounds. Elliott's counsel told this court during oral argument that Dr. Daniels actually testified that the knife in evidence was too short to result in most, if not all, of Best's wounds. This misconstrues Dr. Daniels' testimony as Dr. Daniels never testified to this or anything like this. Moreover, Dr. Daniels' email does not elucidate why he determined that a second knife was used to stab Best. Defense counsel bases his theory regarding Dr. Daniels' reason for concluding there was a second knife on mere conjecture.

{¶ 67} Second, we reject Elliott's contention made in the trial court that Dr. Daniels testified "all the while [ ] kn[owing] that there was a second knife with a longer blade." (Tr. Vol. XI at 6.) On appeal, Elliott repeats that contention, stating Dr. Daniels testified "all the while [ ] believ[ing] a second knife with a longer blade was involved." (Appellant's Brief at 19.) Dr. Daniels was not presented with Ex. EE1 until recross-examination. Dr. Daniels' testimony regarding the number of knives involved in Best's murder occurred *before* he saw Ex. EE1. Before he saw the knife in evidence, Dr. Daniels testified that Best's wounds were consistent with the use of one knife. It was not until Dr. Daniels was "surprised" by Ex. EE1 that he changed his opinion and stated that there was a second knife. Consequently, Dr. Daniels was not hiding anything regarding a second knife when he testified.

{¶ 68} Finally, and most importantly, even with the evidence that a second knife was used in Best's murder, there is not a strong probability of a different outcome. In arguing

to the contrary, Elliott claims he could have used the existence of a second knife to impeach Bledsoe and White because both denied that there was a second knife. But Elliott misconstrues Bledsoe's and White's testimony. Neither Bledsoe nor White was asked about a second knife, so neither denied the existence of a second knife. True, Bledsoe only testified to seeing Elliott use a paring knife, and White referred to Ex. EE1 as "[t]he" knife she saw Elliott use to stab Best. (June 21, 2022 Tr. Vol. VII at 1109.) However, given the facts of this case, it is reasonable that Elliott used a second knife without Bledsoe or White knowing about it.

{¶ 69} Elliott's assault on Best lasted hours. The video surveillance recordings from OSU Hospital show that individuals from apartment B entered apartment C at 3:15 a.m. and 3:32 a.m. White testified that Bledsoe messaged her about 5:00 or 5:30 a.m. to warn her that people were going to work, so she and Elliott needed to leave apartment C. The video surveillance recordings show two individuals, presumably White and Elliott, returning to apartment B at 6:44 a.m. and 7:05 a.m. respectively. Thus, approximately three to four hours elapsed between the time Best's assailants first entered her apartment and they left.

{¶ 70} Neither Bledsoe nor White watched Elliott during the entire hours-long attack on Best. Bledsoe suffered a seizure (or thought he might suffer a seizure) and left apartment C. White stopped watching Elliott assault Best to clean apartment C of blood. White also exited Best's apartment before Elliott, leaving Elliott alone with Best.

{¶ 71} The police found three other knives similar to Ex. EE1 in apartment B, and White identified those knives as part of a block set. Elliott could have grabbed another knife from that set in one of his trips to apartment B and used it to inflict wounds on Best in addition to the ones Bledsoe and White saw him inflict.

{¶ 72} We, of course, can only speculate as to when and how Elliott obtained a second knife. We engage in that speculation merely to point out that Bledsoe's and White's testimony that they saw Elliott with a paring knife is not inconsistent with Elliott also inflicting wounds with another knife. Elliott could have stabbed Best with a second knife when neither Bledsoe nor White were observing him assault Best. Thus, at best, Elliott's counsel could only use the existence of two knives to point out that Bledsoe and White did not see Elliott stab Best each and every time because they did not see Elliott use a second

knife.  But Bledsoe and White had already admitted to the jury that they did not watch Elliott inflict every wound on Best.  Thus, Elliott fails to show a strong probability that evidence of the existence of a second knife would change the outcome of his trial.

**{¶ 73}** In actuality, Elliott wants us to assume that because there were two knives, there must have been two assailants.  This requires immense supposition.  For the sake of argument, however, we will assume that Elliott could somehow demonstrate in a new trial that another individual wielded the second knife.

**{¶ 74}** Elliott was charged with and convicted of aggravated murder pursuant to R.C. 2903.01(A).  Although the indictment does not include a complicity charge, "a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is 'stated * * * in terms of the principal offense' and does not mention complicity."  *State v. Herring*, 94 Ohio St.3d 246, 251 (2002), quoting R.C. 2923.03(F); *accord State v. Hawkins*, 10th Dist. No. 19AP-546, 2021-Ohio-2899, ¶ 61 ("[A] defendant charged with an offense may be convicted of that offense upon evidence that he was complicit in the commission of that crime regardless of whether the indictment against him or her is stated in terms of the principal offense.").  Here, contrary to what Elliott's counsel told this court during oral argument, the state's theory at trial was that Elliott was either the principal offender *or* an accomplice in the aggravated murder of Best.  Additionally, the trial court instructed the jury on accomplice liability with regard to aggravated murder pursuant to R.C. 2903.01(A).

**{¶ 75}** "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus.  In this case, even if the newly discovered evidence could put a second knife in another offender's hands, it could not remove the first knife from Elliott's hands.  Consequently, the evidence at trial would still demonstrate that Elliott stabbed Best numerous times, thus assisting with the murder of Best.  Elliott, therefore, would be culpable for Best's aggravated murder as an accomplice, even if the newly discovered evidence established that a second assailant existed.

{¶ 76} As we stated above, a strong probability of a different outcome does not arise unless the newly discovered evidence places sole responsibility for the crime on someone other than the defendant and exonerates the defendant. *Phillips*, 2014-Ohio-4947, at ¶ 17. The newly discovered evidence in this case does not meet this standard.

{¶ 77} Because the trial court did not abuse its discretion in finding no strong probability that the newly discovered evidence would change the outcome, the trial court did not err in denying Elliott's motion for a new trial. Accordingly, we overrule Elliott's first assignment of error.

## B. Second Assignment of Error—Admission of Polygraph Evidence

{¶ 78} By his second assignment of error, Elliott argues that the trial court erred in refusing to admit into evidence the results of White's polygraph examinations, as well as statements White made during the polygraph examinations. We disagree.

{¶ 79} After her indictment on charges related to Best's murder, White agreed to undergo a polygraph examination. White, her counsel, and the state executed a stipulation regarding the use of the results of the polygraph examination, which was filed as an entry in White's criminal case (hereinafter "the polygraph stipulation"). In relevant part, the polygraph stipulation stated:

> By agreement of the Defendant, the Defendant's attorney and the Prosecuting Attorney, Attorney for the State of Ohio, certain understandings and stipulations have been reached and entered into by said parties, as hereafter follow:
>
> 1. The Defendant will submit to an examination process utilizing in part a device commonly known as a "polygraph" or "lie detector" which examination process may involve a series of interviews and tests employing such device.
>
> * * *
>
> 3. The Prosecuting Attorney or his Assistant shall designate the person who will administer and conduct the testing of the Defendant, such person to be selected from those persons employed by the Ohio State Highway Patrol as properly trained, experienced, and qualified to conduct such testing.
>
> 4. Such person designated by the Prosecuting Attorney or his Assistant shall be permitted, if called as a witness by the State of Ohio or by the Defendant, to testify at trial in this cause as

an "expert" regarding all aspects of the test administered, and such testimony shall be offered and received as evidence in the trial of this cause without objections of any kind by any party to this Agreement except as to the weight of evidence it is to be given.

(Oct. 21, 2022 Def.'s Mot., Ex. 2, Entry of Stipulation.)

{¶ 80} White underwent two polygraph examinations. Each examination included a pre-test interview and the administration of polygraph tests. The polygraph examiner produced reports after each examination that summarized what White said during the examination. In the first report, concerning the August 13, 2021 examination, the polygraph examiner stated he found White's pre-test interview narrative of the events surrounding Best's death substantially consistent with her proffer to the prosecutor. The examiner, however, determined Best made some changes and added certain details. Additionally, the examiner reported that, during the polygraph testing, White denied causing any knife wounds to Best. Due to White's conflicting physiological responses to the questions regarding whether she caused knife wounds to Best, the polygraph examiner could not form an opinion as to White's truthfulness as to those questions.

{¶ 81} In the report regarding the September 8, 2021 examination, the polygraph examiner stated White's pre-test interview version of events again contained minor variances from prior interviews, as well as some additional information. In response to the polygraph examiner's questions, White repeated her earlier denials of stabbing Best. This time, the polygraph examiner opined that White's answers were deceptive.

{¶ 82} During a hearing prior to Elliott's trial, Elliott's counsel asked the trial court to look at the language in White's polygraph stipulation and determine whether that language limited "what [he could] cross-examine a potential witness[] on." (June 8, 2022 Tr. Vol. II at 24.) Initially, the trial court determined that Elliott's counsel could cross-examine White "on the fact that the report indicates that she had been deceptive." *Id.* at 28. However, the court came to a different conclusion when the state reraised the issue on the morning Elliott's trial was scheduled to begin.

{¶ 83} On the first day of trial, the state argued that, under *State v. Rowe*, 68 Ohio App.3d 595 (10th Dist.1990), Elliott had to meet the requirements set forth in *State v. Souel*, 53 Ohio St.2d 123 (1978), before the trial court could admit White's polygraph results

for the purpose of impeachment. Under the first *Souel* requirement, the prosecuting attorney, defendant, and defendant's counsel must sign a stipulation allowing for the admission of polygraph results at trial. The state argued that, in this case, it, Elliott, and Elliott's attorney had not signed such a stipulation, thus precluding the admission of White's polygraph results at Elliott's trial. The trial court agreed, finding:

> The stipulation could have been used against the co-defendant[, White]. If [the] co-defendant had changed her mind and decided that she wanted to go to trial, the State would have had the opportunity to then use her own polygraph against her. Because the stipulation doesn't involve the defendant, the Court finds and believes that the very first requirement under *Souel* * * * was not met, that defendant was not a party to the stipulation, and, therefore, the stipulation cannot be used. Again, that's * * * only to be used by a party to the stipulation. So the Court is going to exclude the use of the polygraph.

(June 13, 2022 Tr. Vol. III at 14-15.)

{¶ 84} On appeal, Elliott argues that the trial court erred in not permitting him to: (1) cross-examine White with her polygraph results, (2) confront White with the inconsistencies between her pre-trial interviews, and (3) call the polygraph examiner as a witness and question him about White's polygraph results and pre-trial interview inconsistencies. We will address each argument in order.

{¶ 85} A trial court has broad discretion in deciding whether to admit or exclude evidence. *State v. Whitaker*, 169 Ohio St.3d 647, 2022-Ohio-2840, ¶ 87. An appellate court will not disturb an exercise of that discretion absent an abuse of discretion. *Id.*

### 1. Exclusion of the Polygraph Results

{¶ 86} In *Souel*, the Supreme Court of Ohio set forth the conditions under which a trial court may admit polygraph results in a criminal trial. The court held:

> The results of a polygraphic examination are admissible in evidence in a criminal trial for purposes of corroboration or impeachment, provided that the following conditions are observed:
>
> (1) The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the

graphs and the examiner's opinion thereon on behalf of either defendant or the state.

(2) Notwithstanding the stipulation, the admissibility of the test results is subject to the discretion of the trial judge, and if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

(3) If the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

> (a) the examiner's qualifications and training;
>
> (b) the conditions under which the test was administered;
>
> (c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and,
>
> (d) at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

(4) If such evidence is admitted the trial judge should instruct the jury to the effect that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged, and that it is for the jurors to determine what weight and effect such testimony should be given.

*Id.* at syllabus.

{¶ 87} The Supreme Court later explained and summarized its holding in *Souel*:

The nature of polygraphs is different from traditional scientific tests. Most, if not all, scientific tests involve objective measurements, such as blood or genetic typing or gunshot residue. In a polygraph test, the bodily response of the examinee to his answers is dependent on the subjective interpretation thereof by the examiner. Inasmuch as the test is not perceived by the profession to be reasonably reliable, its admissibility is limited in Ohio to situations where the parties stipulate to its admission.

*State v. Davis*, 62 Ohio St.3d 326, 341 (1991).

**{¶ 88}** In *Souel*, the Supreme Court addressed whether a court could admit a *defendant's* polygraph results. Subsequent to *Souel*, the question arose whether parties had to meet the *Souel* requirements before a court could admit a *witness's* polygraph results. Elliott contends that this court found the *Souel* requirements inapplicable when a witness's polygraph results were at issue. We, in fact, concluded the exact opposite:

> [T]he same requirements that apply to a defendant's polygraph testing procedure should also apply to the admissibility of *any* polygraph test results in a criminal matter. These requirements are minimum safeguards established to ensure the fairness of proceedings. Therefore, * * * if polygraph test results of a witness can ever be admitted, the requirements of *Souel* must be met.

(Emphasis sic.) *State v. Lascola*, 61 Ohio App.3d 228, 236-37 (10th Dist.1988).

**{¶ 89}** Consistent with our conclusion in *Lascola*, multiple Ohio courts, including this one, have applied the first *Souel* requirement when reviewing the admission or exclusion of witness's polygraph results. These courts have uniformly found that a trial court may not admit a witness's polygraph results if the prosecutor, defendant, and defense counsel do not stipulate to the admissibility of the witness's polygraph results at the defendant's trial. *State v. Penque*, 8th Dist. No. 99209, 2013-Ohio-4696, ¶ 34-35; *State v. Beshara*, 7th Dist. No. 07 MA 37, 2009-Ohio-6529, ¶ 3, 66; *State v. Rucker*, 6th Dist. No. S-99-007, 2000 Ohio App. LEXIS 3819 (Aug. 25, 2000); *State v. Carroll*, 9th Dist. No. 97CA006943, 2000 Ohio App. LEXIS 5975 (Dec. 20, 2000); *State v. Hesson*, 110 Ohio App.3d 845, 857-59 (4th Dist.1996); *Rowe*, 68 Ohio App.3d at 610.

**{¶ 90}** Notably, our state courts are not alone in interpreting the stipulation requirement to necessitate the participation of the parties, i.e., the defendant (along with defense counsel) and the state, before a court may admit the results of a witness's polygraph results. *Walker v. State*, 264 Ga. 79, 80 (1994) (Emphasis sic) ("[W]here the defendant and the state did not stipulate that the results of a polygraph test taken by a witness would be admissible at trial, questioning the witness regarding those test results is impermissible * * *. We find no merit in [the defendant's] argument that [the witness's polygraph] test results were admissible at his trial because there was a stipulation between the State and [the witness] to use the test results at [*the witness's*] trial."); *Pavone v. State*, 273 Ind. 162, 166 (1980) ("Since no written enforceable stipulation was made between the parties, the

evidence of [the witness's] polygraph tests and results was inadmissible."); *Corbett v. State*, 94 Nev. 643, 645-47 (1978) (adopting the same requirements as *Souel* when determining the admissibility of the polygraph results of the defendant and three eyewitnesses); *State v. Yapp*, 45 Wash.App. 601, 606 (1986) (because the record did not include a stipulation by both parties, the trial court did not err in excluding a witness's polygraph results).

{¶ 91} The facts in this case are almost identical to *Beshara*. There, the Seventh District Court of Appeals considered whether the trial court erred in preventing the defendant from cross-examining a witness regarding a failed polygraph. In that case, prior to the polygraph examination, the co-defendant and the state executed a stipulated polygraph agreement permitting admission of the results at the co-defendant's trial. When the polygraph examiner determined the co-defendant was being deceptive regarding his criminal involvement, the co-defendant agreed to plead guilty and testify against the defendant. The trial court found all the polygraph evidence inadmissible at the defendant's trial, and the defendant appealed this ruling.

{¶ 92} On appeal, the Seventh District determined the stipulation did not satisfy the first *Souel* requirement because the parties to the case had not stipulated to the use of the polygraph results in the defendant's trial:

> There is no indication that [the defendant] himself was party to the stipulation involving [the witness's] polygraph test. Further, although the State and [the witness] may have stipulated to their use in [*the witness's*] trial, there is no indication that the State stipulated to their use in [*the defendant's*] trial.

(Emphasis sic.) *Id*. at ¶ 66. Thus, the court held that "the trial court did not abuse its discretion by precluding testimony about the witness's failed polygraph test, since [the defendant] did not formally stipulate to the results and the state did not stipulate to its use in [the defendant's] trial." *Id*. at ¶ 3.

{¶ 93} In this case, White, her counsel, and the state entered a polygraph stipulation in which they agreed that the polygraph examiner could testify at White's trial regarding her polygraph results. Like in *Bashara*, there is no stipulation between Elliott, Elliott's counsel, and the state that Elliott could use White's polygraph results at Elliott's trial. Absent such a stipulation, Elliott has not satisfied the first *Souel* requirement. The trial

court, therefore, did not abuse its discretion in excluding White's polygraph results from evidence.

### 2. No Cross-examination on Inconsistences between Prior Pre-trial Statements

**{¶ 94}** Elliott next argues that the trial court erred in not allowing him to cross-examine White regarding the inconsistences between White's first pre-test interview and proffer, as well as the inconsistencies between White's second pre-test interview and prior statements. We disagree.

**{¶ 95}** "As a general rule, 'prior inconsistent statements constitute hearsay evidence and thus are admissible only for the purpose of impeachment.' " *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 128, quoting 1 Gianelli, *Evidence*, Section 607.4, at 482-83 (3d Ed.2010). Evid.R. 613 governs the use of prior inconsistent statements to impeach a witness. According to Evid.R. 613(B):

> Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both the following apply:
>
> (1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
>
> (2) The subject matter of the statement is one of the following:
>
>> (a) A fact that is of consequence to the determination of the action other than the credibility of a witness;
>>
>> (b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B);
>>
>> (c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

**{¶ 96}** "The underlying rationale for Rule 613 is self-contradiction; it involves the use of a witness's own statements to contradict that witness's present testimony." 1 Giannelli, *Evidence*, Section 613.4, at 601 (4th Ed.2020). Consequently, "[t]o be admissible, the prior statement must be inconsistent with the witness's trial testimony." *Id.*

{¶ 97} In the trial court, Elliott never sought to use the statements White made in the pre-test interviews to impeach White's trial testimony. On appeal, he does not claim he was barred from confronting White with differences between her trial testimony and what she said in her pre-test interviews. Rather, Elliott only contends that the trial court should have allowed him to explore the inconsistencies between White's various pre-trial versions of events. Evid.R. 613(B), however, does not allow for this. Absent a conflict between White's trial testimony and a prior statement, Evid.R. 613(B) does not apply. Elliott does not identify any such conflict. Therefore, we have no grounds on which to find error.

### 3. Exclusion of the Polygraph Examiner's Testimony

{¶ 98} Third, Elliott argues that the trial court erred in refusing to allow the polygraph examiner to testify regarding his findings and the statements White made during her pre-test interviews. Elliott initially contends that the polygraph examiner could offer an expert opinion as to White's truthfulness without disclosing the nature of his expertise. Elliott misses the point. The problem here is not the word "polygraph," but the unreliable nature of the polygraph evidence itself. Because the parties did not comply with the safeguards set by *Souel*, the polygraph results were inadmissible. The polygraph examiner, therefore, could not testify to them.

{¶ 99} We also find that a trial court cannot tell a jury a witness is an expert in ascertaining deception and leave the jury guessing the basis of the witness's expertise. An expert witness cannot offer an opinion without revealing his or her expertise because, without knowing the basis for the witness's superior knowledge on a topic, the jury lacks the means to assess the weight of the opinion.

{¶ 100} Elliott next asserts that the polygraph examiner could testify as to what White said in the pre-test interviews. Elliott, however, does not explain how this testimony amounts to anything more than inadmissible hearsay.

### 4. Whether Exclusion of Polygraph Evidence Violates the Right to Confront an Adverse Witness

{¶ 101} As a final matter, Elliott argues that the exclusion of the polygraph evidence violated his constitutional right to confront adverse witnesses because it impacted his ability to cross-examine White. We disagree.

{¶ 102}  The Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee a defendant's right to cross-examine the state's witnesses.  *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, ¶ 151.   These constitutional provisions ensure "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis sic.)   *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).   A trial court may constitutionally impose limits on a defense counsel's cross-examination into the potential biases of a prosecution witness.  *State v. Brunson*, 171 Ohio St.3d 384, 2022-Ohio-4299, ¶ 53; *accord Van Arsdall* at 679 (holding that a trial court may "impose reasonable limits on [] cross-examination [into the potential bias of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant").

{¶ 103}  To establish the denial of the confrontation right, the defendant must first show "he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness."  *Van Arsdall* at 680; *accord McAlpin* at ¶ 152 (applying the same test).   The defendant must then demonstrate that the denial of the opportunity to cross-examine the witness prejudiced the defendant.  That prejudice inquiry focuses on the particular witness, not on the outcome of the entire trial. *Van Arsdall* at 680.  A defendant is prejudiced if "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination."  *Id.*

{¶ 104}  As we stated above, Elliott failed to satisfy the first *Souel* requirement, rendering White's polygraph results inadmissible.  Furthermore, Elliott did not establish White's prior inconsistent statements during the pre-test interviews as admissible under an Ohio Rule of Evidence.  Consequently, the trial court placed limitations on White's cross-examination to comply with Ohio law, not to stymie Elliott from appropriately cross-examining White.   Elliott, therefore, has failed to demonstrate a violation of his confrontation right.

{¶ 105} Nevertheless, even if Elliott had shown a legitimate inability to appropriately cross-examine White, he has not proven that that inability prejudiced him.

Elliott argues that the jury needed to hear about the deceptive polygraph results and White's prior inconsistent statements to properly assess White's credibility. However, White admitted during her testimony that she had previously lied when recounting the murder.

{¶ 106} On direct examination, White testified she provided the state information about Best's murder at least three different times after her arrest, but she did not tell the "whole truth" until the final meeting. (June 21, 2022 Tr. Vol. VII at 1048-49.) White admitted that when she first spoke to the police, she "tried to lie to them." *Id.* at 1103. She did not tell the police she assaulted Best, nor did she give the police details about what happened the night of Best's murder. On cross-examination, Elliott elicited the following testimony:

> Q: Now even though on several occasions when the time [the State] had been dealing with you, they've caught you not being truthful; ain't that correct?
>
> A: Yes.
>
> Q: And they caught you not being truthful about your involvement in this murder; isn't that correct?
>
> A: Yes.

*Id.* at 1131. With White already admitting to obfuscation and dishonesty, Elliott cannot show his disallowed cross-examination would have given the jury a significantly different impression of White's credibility. Thus, Elliott cannot establish the prejudice necessary to prove a violation of the confrontation right.

{¶ 107} In sum, we conclude that the trial court did not err in: (1) excluding from evidence White's polygraph results, (2) excluding from evidence the statements White made during the pre-test interviews, and (3) refusing to allow the polygraph examiner to testify. We also conclude that the trial court did not violate Elliott's confrontation right when it prevented his counsel from cross-examining White using the polygraph evidence. Accordingly, we overrule Elliott's second assignment of error.

### C. Third Assignment of Error—Admission of Victim-Impact Evidence

{¶ 108} By Elliott's third assignment of error, he argues that the admission of victim-impact evidence violated his rights to due process, which deprived him of a fair trial.

Elliott asserts two violations of due process: (1) the prosecutor engaged in misconduct during the opening statement by commenting on Best's disabilities and social challenges, and (2) the admission of the testimony of Best's mother regarding the same topics.

{¶ 109} The prosecutor began his opening statement by telling the jury that "fate wasn't kind" to Best. (June 14, 2022 Tr. Vol. IV at 311.) Best, he explained, "was born with intellectual and developmental disabilities" that "made things hard for her in her life." *Id.* Best did not always show her emotions, so "people didn't really understand how to understand Maria." *Id.* Best, therefore, struggled for acceptance by her peers. According to the prosecutor, Best's "desperate yearning" for acceptance "would lead to her falling in with the wrong sort of people and these people would take advantage of her. They would take advantage of her generosity." *Id.* at 312-13.

{¶ 110} Best's mother testified that Best was born with a developmental delay, which became evident early in her life. As a result of this delay, Best "struggled to fit in, make friends at school." (June 15, 2022 Tr. Vol. V at 409.) Best "always treated people as if they had good intentions. * * * She always wanted to help everyone." *Id.* at 411. Friendships and acceptance by others were extremely important to Best.

{¶ 111} In general, Best's mother stated, Best "didn't have the ability to gauge her environment. She had no real understanding of danger." *Id.* at 418. Best's mother described an instance where someone convinced Best to appoint them the payee to receive Best's Social Security Disability Income, and then that person took Best's money. Best's mother said that Best and Bledsoe would call on her when they found themselves in a dangerous situation.

{¶ 112} Best's mother also explained that Best had been diagnosed with bipolar disorder. Best presented herself differently depending on her mental state. Best "could be just complacent" and "shut down and just agree[d] to everything that you said." *Id.* at 413. Alternatively, she was "very agitated" and "logic was just completely out the door." *Id.* Prior to her death, Best had undergone hospitalization to ensure she regularly received medication for her mental disorder.

{¶ 113} Elliott claims that any reference to Best's personal characteristics violated his due process rights. The Due Process Clause of the Fourteenth Amendment "is a protection against criminal trials in state courts conducted in such a manner as amounts to

a disregard of 'that fundamental fairness essential to the very concept of justice,' and in a way that 'necessarily prevents a fair trial.' "[1] *Lyons v. Oklahoma*, 322 U.S. 596, 605 (1944), quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941). The Due Process Clause prohibits both: (1) the admission of evidence that renders a trial fundamentally unfair, *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012), and (2) prosecutorial misconduct, *Greer v. Miller*, 483 U.S. 756, 765 (1987). We will first address whether the admission of the testimony of Best's mother violated Elliott's rights to due process.

### 1. Whether Admission of Victim-Impact Evidence Denied Elliott a Fair Trial

{¶ 114} Ordinarily, state and federal statutes and rules govern the admissibility of evidence. *Perry* at 237. Violations of the Due Process Clause occur "[o]nly when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.' " *Id.*, quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal quotation marks omitted). Courts "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling* at 352. "The kind of foundational unfairness and arbitrariness needed to show that a flawed state court evidentiary ruling rises to the level of a due process violation is not a broad category." *Burger v. Woods*, 515 Fed.Appx. 507, 510 (6th Cir.2013).

{¶ 115} By not objecting to the testimony of Best's mother on due process grounds, Elliott forfeited the issue for purposes of appeal. We, consequently, review this issue for plain error. To establish that plain error occurred, a defendant must show that "an error occurred, that the error was obvious, and that there is 'a reasonable *probability* that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis sic.) *McAlpin*, 2022-Ohio-1567, at ¶ 66, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22.

{¶ 116} Elliott characterizes the evidence he challenges as "victim-impact evidence." "Victim-impact evidence includes evidence relating to the victim's personal characteristics and the impact that the crimes had on the victim's family." *State v. Graham*,

---

[1] Elliott claims violations of his due process rights under both the federal and state constitutions. The Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Due Course of Law Clause in Article I, Section 16 of the Ohio Constitution provide equivalent due process protections. *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, ¶ 11.

164 Ohio St.3d 187, 2020-Ohio-6700, ¶ 113. Victim-impact evidence "is admissible when it is related to 'the facts attendant to the offense.' " *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 134, quoting *State v. Fautenberry*, 72 Ohio St.3d 435, 440 (1995); *accord State v. Beuke*, 38 Ohio St.3d 29, 40 (1989) ("Victim background evidence may be relevant to establishing facts of consequence or otherwise necessary to prove an element of the crime.").

{¶ 117} In this case, the state charged Elliott with aggravated murder under R.C. 2903.01(A), which required the state to prove Elliott caused Best's death "purposely, and with prior calculation and design." Three factors guide an inquiry into whether a defendant acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption or events'?" *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist.1976).

{¶ 118} We find the information Best's mother gave regarding Best assisted the jury in understanding Elliott's and Best's relationship and how it degraded so quickly. The testimony at issue helped explain to the jury Best's motivation for allowing Bledsoe, Elliott, and Adams to live in her apartment, as well as Best's willingness to maintain her relationships with Bledsoe, Elliott, and Adams despite the friction that arose. The testimony also elucidated Best's reactions to Elliott, particularly her complacency when Elliott first became violent with her and her initial compliance when Elliott demanded she clean her room. Elliott lost the control that Best's initial capitulation gave him when Best sought the assistance of the police. Once Elliott lost control over Best, he decided that "he would take care of it" he was "going to kill [Best]." (June 16, 2022 Tr. Vol. VI at 713.) The testimony of Best's mother, therefore, was relevant.

{¶ 119} Elliott also argues that this evidence was prejudicial because it portrayed him as a "bad" person who bullied Best, thus inflaming the jury to convict Elliott. Best's mother, however, never mentioned Elliott at all during direct examination, much less characterized him as a "bad" person. While Best's mother told the jury about her daughter's developmental and mental health challenges, she neither canonized Best nor demonized

Elliott.  In short, the testimony was informational, not emotional.  We, consequently, do not conclude that the testimony prejudiced Elliott.[2]

**{¶ 120}**  Therefore, the admission of the testimony of Best's mother was not so extremely unfair that its inclusion in Elliott's trial violated fundamental conceptions of justice.  We, therefore, find no violation of Elliott's due process rights occurred.  Admission of the testimony of Best's mother was not error, much less plain error, warranting reversal.

## 2.  Whether the Prosecutor Engaged in Misconduct by Commenting on Best's Personal Characteristics in the Opening Statement

**{¶ 121}**  Next, Elliott argues that the prosecutor committed misconduct by commenting about Best's personal characteristics during the opening statement.  We disagree.

**{¶ 122}**  "[P]rosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.' " *Greer*, 483 U.S. at 765, quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Prosecutorial misconduct occurs when a prosecutor's remarks are improper, and they prejudicially affect the defendant's substantial rights.  *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, ¶ 119.

**{¶ 123}**  An opening statement acquaints a jury with the general nature of the case and outlines the facts that counsel expects the evidence to show.  *State v. D.E.M.*, 10th Dist. No. 15AP-589, 2016-Ohio-5638, ¶ 76.  " 'During opening statement, counsel is accorded latitude and allowed fair comment on the facts to be presented at trial.' " *Beasley* at ¶ 120, quoting *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 157.

**{¶ 124}**  A defendant, like Elliott, who fails to object to a prosecutor's allegedly improper comments has forfeited all but plain error.  An appellate court will only reverse for plain error if the defendant establishes that a conviction would not have resulted in the absence of the allegedly improper comments.  *D.E.M.* at ¶ 75; *State v. Kenney*, 10th Dist. No. 09AP-231, 2010-Ohio-3740, ¶ 11.

**{¶ 125}**  Here, the prosecutor based his comments regarding Best on the testimony he expected Best's mother to give, which we have found both relevant and non-prejudicial.  The prosecutor's comments, therefore, constituted "fair comment" on the evidence.

---

[2] We also note that "the Supreme Court has never held * * * that a state trial court's admission of *relevant* evidence, no matter how prejudicial, amounted to a violation of due process." (Emphasis sic.)  *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir.2012).

Accordingly, we determine that no improper remarks occurred, thus precluding any error based on prosecutorial misconduct.

{¶ 126}  In sum, we find no violation of Elliott's due process rights.  We thus overrule Elliott's third assignment of error.

### D.  Fourth Assignment of Error–Admission of Other-Acts Evidence

{¶ 127}  By Elliott's fourth assignment of error, he argues that the trial court erred in admitting other-acts evidence.  We disagree.

{¶ 128}  "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  Former Evid.R. 404(B) (effective July 1, 2012 through June 30, 2022).[3]  However, evidence of a defendant's other crimes, wrongs, or acts is admissible "*for other purposes*, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  (Emphasis added.)  *Id*.  "The key [to admission] is that the evidence must prove something other than the defendant's disposition to commit certain acts."  *Hartman*, 2020-Ohio-4440 at ¶ 22.  The admissibility of other-acts evidence under Evid.R. 404(B) is a question of law that an appellate court reviews de novo.  *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, ¶ 117.

{¶ 129}  In determining whether to admit other-acts evidence, a court must consider whether the evidence is relevant to the particular purpose for which it is offered.  *Hartman* at ¶ 26.  That is, the other-acts evidence must be probative of a non-propensity purpose, such as one of the permissible purposes listed in Evid.R. 404(B).  *Id*.  Moreover, the court must evaluate whether the non-propensity purpose relates to a material issue that is in dispute between the parties.  *Id*. at ¶ 27.

---

3  Evid.R. 404(B) was revised in 2022.  Effective July 1, 2022, the rule reads in relevant part:

> (B)     Other crimes, wrongs, or acts
>
> (1)  Prohibited uses.  Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2)  Permitted uses; notice.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

**{¶ 130}**  As part of its inquiry, a court must also ascertain that the party offering the evidence has provided " 'substantial proof that the alleged [other] act was committed by the defendant.' "  *Id.* at ¶ 28, quoting *State v. Carter*, 26 Ohio St.2d 79, 83 (1971).  Other-acts evidence " 'is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.' "  *Id.*, quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988).

### 1.  Relevancy Challenges to Other-Acts Evidence

**{¶ 131}**  Here, the State offered other-acts evidence against Elliott to prove identity, i.e., he was the person who committed the crimes charged in the indictment.  Other acts are evidence of identity where the acts " 'form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment,' and which are 'inextricably related to the alleged criminal act.' "  *State v. Lowe*, 69 Ohio St.3d 527, 531 (1994), quoting *State v. Curry*, 43 Ohio St.2d 66, 73 (1975).

**{¶ 132}**  The two other acts at issue are:  (1) Elliott yanking Best out of the back seat of Tracy's parked car at Clean Rite Center, and (2) Elliott shoving Best into her bedroom wall.  These two acts served as the impetus for Best to seek police assistance in evicting everyone from her apartment and pressing charges against Elliott.  According to the testimony of Bledsoe, White, and Tracy, when Best would not reconsider the eviction or the charges, Elliott entered Best's apartment and attacked Best.  Thus, the two other acts form part of the immediate background of the crimes charged in the indictment and are inextricably related to those crimes.[4]

**{¶ 133}**  Elliott's primary argument against the relevancy of the other-acts evidence is that the state failed to provide substantial proof of the other acts.  Elliott points out that the video recording of the Clean Rite Center incident does not actually show him dragging Best out of the car.  Elliott is correct:  the recording skips a minute and, thus, does not depict what happened immediately after Elliott reached into the back seat and yanked at something or someone.  However, Best reported to Officer Schwartz that in that missing minute Elliott "pulled [her] out of the car by [her] hair and [her] arms and threw [her] to the ground."  (Pl.'s Ex. H2, Officer Schwartz Body-worn camera.)

---

[4]  Elliott contends that the other acts do not form part of the "immediate" background of the crimes because they occurred approximately 36 hours prior to the crimes.  We do not find this argument plausible.

**{¶ 134}** Regarding the incident in Best's bedroom, Elliott complains that "no one actually witnessed Elliott slamming Best's head into the wall back at the apartment." (Appellant's Brief at 46.) To the contrary, Best witnessed it. She told Officer Wolfe that Elliott had "shoved [her] into the wall in [her] bedroom." (Pl.'s Ex. B, Officer Wolfe Body-worn camera.) She also showed Officer Wolfe a bruise on her forehead that resulted from her collision with the bedroom wall. Additionally, Bledsoe testified that, while Elliott and Best were alone in the bedroom, Bledsoe heard a "thump, like * * * a very loud noise," and the "next thing [he] kn[e]w there was a hole in the [bedroom] wall." (June 16, 2022 Tr. Vol. VI at 856.) Photographs of Best's bedroom wall show a circular hole in the drywall underneath the window.

**{¶ 135}** Based on the foregoing evidence, we conclude that the state met its burden to provide substantial proof of the other acts. The jury could reasonably conclude that both acts occurred, and Elliott committed both acts.

**{¶ 136}** Elliott next challenges the relevancy of the other-acts evidence by arguing that identity was not a material issue in dispute between the parties. Identity is at issue when the fact of the crime is open and evident, but the perpetrator is unknown, and the accused denies that he or she committed the crime. *State v. Hernandez*, 8th Dist. No. 108265, 2019-Ohio-5242, ¶ 26; *State v. Fannon*, 4th Dist. No. 17CA24, 2018-Ohio-5242, ¶ 74. Here, the fact of Best's murder was open and evident, but the murderer unknown. Because Elliott denied murdering Best, identity was a material issue in dispute.

**{¶ 137}** Finally, Elliott asserts that the other acts in this case cannot show identity because they do not share common features with the crime in question. More specifically, Elliott argues that the other acts are irrelevant to proving identity because they do not involve stabbings and, thus, are insufficiently similar to the murder. Elliott misinterprets the precedent he relies upon for this argument. According to that precedent, "other-acts evidence must * * * share common features with the crime in question" "[t]o be admissible to prove identity *through a certain modus operandi.*" (Emphasis added.) *Lowe*, 69 Ohio St.3d at 531. Here, because the state did not offer the other-acts evidence to prove a certain modus operandi, the other-acts evidence did not have to share common features with the charged crime.

{¶ 138} In sum, we conclude that the trial court did not err in admitting the other-acts evidence under Evid.R. 404(B). Elliott, however, argues that even if the other-acts evidence was admissible under Evid.R. 404(B), it was inadmissible under Evid.R. 403(A), which requires the exclusion of relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice."

### 2. Prejudice Challenge to Other-Acts Evidence

{¶ 139} If a court determines that the proffered evidence is admissible under Evid.R. 404(B), it must next turn to Evid.R. 403(A) and decide whether the proffered evidence is more prejudicial than probative. *Hartman*, 2020-Ohio-4440, at ¶ 29. A trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice involves an exercise of judgment and, thus, is reviewed for an abuse of discretion. *Worley*, 2021-Ohio-2207 at ¶ 117.

{¶ 140} "Evid.R. 403 manifests a definite bias in favor of admissibility." *State v. Marshall*, 10th Dist. No. 20AP-394, 2022-Ohio-3795, ¶ 20. Exclusion of evidence under Evid.R. 403(A) requires more than mere prejudice, because any evidence adverse to a party's case could be deemed prejudicial. *Worley* at ¶ 125. Consequently, Evid.R. 403(A) only mandates exclusion of "evidence that is *unfairly* prejudicial." (Emphasis sic.) *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 23. "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *Id.* at ¶ 24. Usually, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect. *Id.*

{¶ 141} In deciding whether to exclude evidence under Evid.R. 403(A), a trial court should view "relevant evidence, challenged as being outweighed by its prejudicial effects, * * * in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to one opposing admission." *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). Consequently, for evidence to be inadmissible under Evid.R. 403(A), its "probative value must be minimal and the prejudice great." *State v. Morales*, 32 Ohio St.3d 252, 258 (1987); *accord State v. Hicks*, 10th Dist. No. 18AP-883, 2020-Ohio-548, ¶ 21, quoting *State v. Shipley*, 10th Dist. No. 12AP-948, 2013-Ohio-4055, ¶ 61 (" 'In order for the evidence to be deemed inadmissible, its probative value must be minimal and its prejudicial effect great.' ").

{¶ 142} Elliott asserts that the other-acts evidence was unfairly prejudicial because so many of the state's witnesses and exhibits related to the other-acts evidence. The other-acts evidence repeatedly arose during Elliott's trial because the two prior assaults formed the immediate background of the charged offenses. Due to the close connection between the other acts and Best's murder, the probative value of the other acts was high. Furthermore, to mitigate any possible unfair prejudice to Elliott, the trial court instructed the jury:

> [E]vidence was admitted of another act which the defendant may have committed. You may not consider that evidence to determine whether the defendant committed any act alleged in the indictment. You are to consider this evidence only on the additional issue of identity.
>
> * * *
>
> The State must prove identity beyond a reasonable doubt. If you find that defendant committed the other act, you may not presume that he committed the acts alleged. You may, however, consider the other act, along with all the other evidence, in deciding whether the State proved beyond a reasonable doubt that the defendant, rather than some other person, committed the offense charged.

(June 23, 2022 Tr. Vol. IX at 1432-33.) Given the broad discretion invested in the trial court to determine prejudice and the instruction to the jury limiting the use of the other-acts evidence, we find no error in the trial court's determination that the other-acts evidence did not unfairly prejudice Elliott.

### 3. Due Process Challenge to Other-Acts Evidence

{¶ 143} In addition to challenging the admission of the other-acts evidence under Evid.R. 404(B) and 403(A), Elliott also argues that allowing the state to introduce the other-acts evidence deprived him of his due process rights. As we stated above, violations of the Due Process Clause occur "[o]nly when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.' " *Perry*, 565 U.S. at 237, quoting *Dowling*, 493 U.S. at 352. A defendant is not denied a fair trial, and thus due process, by the admission of other-acts evidence that is more probative than prejudicial. *Coleman v. Mitchell*, 268 F.3d 417, 440 (6th Cir.2001); *Pennington v. Lazaroff*, 13 Fed.Appx. 228, 232

(6th Cir.2001). Consequently, the admission of the other-acts evidence in this case did not violate Elliott's due process rights.

{¶ 144} In sum, we conclude that the trial court did not violate Evid.R. 404(B), Evid.R. 403(A), or the due process provisions of the federal or state constitutions in admitting the other-acts evidence. Accordingly, we overrule Elliott's fourth assignment of error.

### E.  Fifth Assignment of Error–Ineffective Assistance of Counsel

{¶ 145} By Elliott's fifth assignment of error, he argues that he was deprived of effective assistance of counsel. We disagree.

{¶ 146} To prevail on an ineffective assistance claim, a defendant must meet the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. *Strickland* at 687; *State v. Bradley*, 42 Ohio St.3d 136, 141 (1989). To meet that requirement, the defendant must demonstrate that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland* at 687. Counsel's conduct is deficient if it falls below an objective standard of reasonable representation. *Strickland* at 688; *Bradley* at 142.

{¶ 147} If the defendant shows that counsel's performance was deficient, then the second prong of the *Strickland* test requires the defendant to prove prejudice to prevail. *Strickland* at 687; *Bradley* at 141-42. To demonstrate prejudice, the defendant must show "that there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694; *accord Bradley* at 142.

### 1.  No Objection to Victim-Impact Testimony

{¶ 148} First, Elliott argues that his counsel was ineffective because he did not object to the victim-impact testimony of Best's mother. Trial counsel is not ineffective for failing to object to admissible testimony. *State v. Rudasill*, 10th Dist. No. 19AP-61, 2021-Ohio-45, ¶ 48; *State v. Daniels*, 10th Dist. No. 14AP-326, 2015-Ohio-2649, ¶ 32. As we found above, the testimony of Best's mother was both relevant and non-prejudicial. Consequently, Elliott's counsel was not ineffective for failing to object to it.

## 2.  No Objection to Tracy's Testimony Regarding his Dog

{¶ 149}   Second, Elliott contends that his counsel was ineffective because he did not object to Tracy's testimony regarding his dog's reaction to Elliott.  Tracy testified that he was walking his dog early on the morning after Best's murder when Elliott exited Best's apartment.  Elliott picked up Tracy's dog and started petting her.  Tracy said the dog was "shaking" and "scared." (June 21, 2022 Tr. Vol. VI at 724.)  When Elliott put the dog down, she ran and hid underneath Tracy's car.  Tracy explained that his dog's reaction was not normal.

{¶ 150}   The failure to object, alone, is not enough to sustain a claim of ineffective assistance of counsel.  *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, ¶ 117.  Withholding an objection may be a tactical decision because:

> "experienced trial counsel learns that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state.  Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

*State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006).

{¶ 151}   Considering the totality of the evidence in this case, trial counsel could reasonably calculate that Tracy's testimony regarding the dog would not affect the outcome of the trial.  We thus conclude that defense counsel made a strategic choice not to object.  Given the slight importance of the testimony, we find it was not so prejudicial that the failure to object essentially defaulted the case to the state.  Trial counsel, therefore, was not ineffective in failing to object to the testimony regarding the dog's reaction to Elliott.

## 3.  Ineffective Cross-Examination of Tracy

{¶ 152}   Third, Elliott argues that his trial counsel was ineffective in his cross-examination of Tracy because he raised prejudicial topics.  However, "[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel."  *Leonard*, 2004-Ohio-6235, at

¶ 146. When reviewing a claim of ineffective assistance of counsel, an appellate court must not scrutinize a trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination. *State v. Harris*, 10th Dist. No. 21AP-678, 2023-Ohio-3994, ¶ 107. Here, Elliott disagrees with the strategic decisions his trial counsel made during Tracy's cross-examination, but that is not a basis for a claim of ineffective assistance of counsel.

### 4. Failure to Object to "Death by a Thousand Cuts"

{¶ 153} Fourth, Elliott argues that his trial counsel was ineffective because he failed to object when the prosecutor asked Dr. Daniels, "Have you ever heard of the phrase, 'Death by a thousand cuts?['] " (June 16, 2022 Tr. Vol. VI at 822.) Elliott contends that this question was prejudicial because it suggested that Best had literally died of a thousand stab wounds.

{¶ 154} Elliott's argument ignores that "death of (or by) a thousand cuts" is a commonly used phrase that means "a succession of minor hurts that are cumulatively very serious or annoying." *Oxford English Dictionary* (2d Ed.1989) (found under the definition of "thousand" in sense 2.b.). Dr. Daniels unequivocally testified that Best had sustained 44 sharp force injuries. After asking Dr. Daniels if he had heard of the phrase "death by a thousand cuts," the prosecutor asked, "Does that apply possibly in this situation?" (June 16, 2022 Tr. Vol. VI at 822.) Dr. Daniels answered, "It can, because all of these wounds are actively bleeding when they've been sustained. You know, individually or in small groups, these wounds may not be lethal, but if you have enough superficial wounds, the amount of blood loss occurring may be significant." *Id.* In other words, Dr. Daniels replied that Best's wounds could fit the phrase "death by a thousand cuts" because although most of the 44 wounds she sustained were minor, they could be very serious cumulatively.

{¶ 155} Because "death by a thousand cuts" is a commonly understood phase, Elliott's trial counsel had no reason to suspect that any jury member would interpret this phrase literally. Consequently, trial counsel had no basis on which to object, and we conclude that no prejudice resulted. Elliott, thus, cannot prevail on his claim for ineffective assistance of counsel.

**5. Cumulative Error**

{¶ 156} Finally, Elliott argues that trial counsel was ineffective based on the cumulative effect of his errors during trial. Under the cumulative error doctrine, an appellate court will reverse a conviction "when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous errors does not individually constitute cause for reversal." *Graham*, 2020-Ohio-6700, at ¶ 169. However, "when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together." *Id*. at ¶ 170. In this case, we have found no merit in any of Elliott's claims for ineffective assistance of counsel and, thus, we reject his claim that the cumulation of his counsel's alleged errors resulted in ineffective assistance.

{¶ 157} In sum, Elliott has failed to demonstrate that his trial counsel provided ineffective assistance. Accordingly, we overrule Elliott's fifth assignment of error.

**F. Sixth Assignment of Error–Insufficient Evidence and Against the Manifest Weight of the Evidence**

{¶ 158} By Elliott's sixth assignment of error, he argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

{¶ 159} Challenges to the sufficiency of the evidence and the weight of the evidence are distinctly different: " 'a challenge to the sufficiency of the evidence attacks its adequacy * * * while a challenge to the weight of the evidence attacks is persuasiveness.' " *State v. Jordan*, __ Ohio St.3d __, 2023-Ohio-3800, ¶ 15, quoting *Disciplinary Counsel v. Smith*, 152 Ohio St.3d 337, 2017-Ohio-9087, ¶ 23. In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4. "[A]n appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, ¶ 19, quoting

*Jenks* at paragraph two of the syllabus. Whether the evidence is legally sufficient to sustain a conviction is a question of law, which an appellate court reviews de novo. *State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, ¶ 15

{¶ 160} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving the conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "Sitting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion." *Jordan* at ¶ 17. However, the appellate court's authority to reverse on manifest-weight grounds " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 161} In large part, Elliott attacks the credibility of the evidence against him, which amounts to a challenge to the manifest weight of the evidence. However, Elliott asserts two arguments that we construe as challenges to the sufficiency of the evidence. In the first argument, he contends that reasonable doubt exists as to whether the paring knife, identified as Ex. EE1, was the murder weapon. In the second, he argues that he did not tamper with any evidence because White, alone, cleaned Best's apartment. We will address each argument in order.

### 1. Sufficiency of the Evidence–Existence of a Second Knife

{¶ 162} By his first sufficiency argument, Elliott challenges his conviction for aggravated murder in violation of R.C. 2903.01(A), which states, "No person shall purposely, and with prior calculation and design, cause the death of another." Here, both Bledsoe and White testified that they saw Elliott repeatedly stab Best. Bledsoe said that Elliott used a paring knife to stab Best, and White referred to Ex. EE1, a paring knife, as "[t]he" knife she saw Elliott use to stab Best. (June 21, 2022 Tr. Vol. VII at 1109.) Elliott contends that this paring knife was too short to cause Best's deeper stab wounds and, thus, a second, longer knife also must have been used. Apparently, Elliott believes the existence

of a second knife renders the evidence inadequate to prove that he committed aggravated murder pursuant to R.C. 2903.01(A).

{¶ 163} As we explained above, "a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is 'stated * * * in terms of the principal offense' and does not mention complicity." *Herring*, 94 Ohio St.3d at 251. "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *Johnson*, 93 Ohio St.3d at syllabus.

{¶ 164} In this case, Bledsoe testified that he saw Elliott punch Best multiple times, stab Best in her kneecap, legs, and head, and slit Best's throat. White testified that she saw Elliott cut Best's throat multiple times, and stab Best in her chest, back, buttocks, leg, the back of her head, and the top of her head. White explained that when Elliott stabbed Best in the top of her head, the knife blade bent. Ex. EE1, the knife recovered from the trash can outside of Best's apartment, had a bent blade. White identified Ex. EE1—the paring knife— as the knife Elliott used to stab Best.

{¶ 165} Dr. Daniels testified that the cause of Best's death was "[m]ultiple sharp force injuries of the head, neck, chest and abdomen." (June 16, 2022 Tr. Vol. VI at 803.) Most of Best's wounds were shallow; only 5 of 44 wounds were deeper than 3 inches.

{¶ 166} The foregoing evidence, if believed, would convince a reasonable trier of fact that Elliott repeatedly stabbed Best with the paring knife. Even if a second perpetrator—with a second, longer knife—inflicted the deeper wounds, Elliott assisted that perpetrator in causing Best's death by inflicting the shallower wounds. A rational trier of fact, therefore, could find that Elliott committed aggravated murder under R.C. 2903.01(A) beyond a reasonable doubt.

### 2. Sufficiency of the Evidence–Tampering with the Evidence

{¶ 167} In his second sufficiency argument, Elliott challenges his conviction for tampering with evidence in violation of R.C. 2921.12(A)(1), which provides, "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or

thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." Elliott argues that White, alone, altered the crime scene when she cleaned up Best's apartment on her own initiative.

{¶ 168} This argument, however, disregards White's testimony that she left in Best's apartment a garbage bag containing bloody rags, the plastic gloves she had been wearing, Best's bloody clothes, and cigarette butts. White exited Best's apartment before Elliott. Elliott, therefore, was the last person in possession of the garbage bag. When the police arrived at Best's apartment, the garbage bag was gone. The logical inference is that Elliott disposed of the garbage bag.

{¶ 169} This evidence would convince a reasonable juror that Elliott concealed evidence relating to the investigation of Best's murder. Consequently, a rational trier of fact could find Elliott guilty of tampering with evidence under R.C. 2921.12(A)(1) beyond a reasonable doubt.

### 3. Manifest Weight–The Credibility of Bledsoe and White

{¶ 170} In addition to attacking the sufficiency of the evidence, Elliott also argues that his convictions are against the manifest weight of the evidence. Elliott contends that the jury could not believe Bledsoe's or White's testimony because Bledsoe and White: (1) admitted to lying when initially questioned about Best's murder, (2) had prior convictions and faced criminal charges related to the murder, (3) were intoxicated at the time of the murder, and (4) had their own motive to murder Best.

{¶ 171} The credibility of the witnesses is a matter primarily for the trier of fact to determine. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. A reviewing court gives deference to the jury's determination of witness credibility because the jury "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). In judging witness credibility, a jury "may believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67 (1964). Additionally, when deciding whether to believe a particular witness's testimony, a jury may " 'consider the reasonableness of the testimony and all the facts and circumstances surrounding the

testimony.' " *State v. Greenwood*, 10th Dist. No. 19AP-683, 2021-Ohio-921, ¶ 41, quoting *State v. Brown*, 10th Dist. No. 15AP-935, 2016-Ohio-7944, ¶ 35.

{¶ 172} Elliott first asserts that Bledsoe and White are not credible because they initially lied to the police about Best's murder. Bledsoe admitted that when he was first interviewed, he did not tell the police what happened the night of Best's murder because he "was afraid for [his] life." (June 21, 2022 Tr. Vol. VI at 886.) Bledsoe started seizing during that first interview, which terminated the interview prematurely. Bledsoe said that he told the truth during his second interview because he "kn[e]w that the two people," presumably Elliott and White, "was locked up." *Id.* at 911.

{¶ 173} White also admitted that she initially lied to the police about the murder. Defense counsel ensured that the jury knew about these lies by eliciting the following testimony on cross-examination:

> Q: Now even though on several occasions when the time [the State] had been dealing with you, they've caught you not being truthful, ain't that correct?
>
> A: Yes.
>
> Q: And they caught you not being truthful about your involvement in this murder; isn't that correct?
>
> A: Yes.

(June 16, 2022 Tr. Vol. VII at 1131.)

{¶ 174} White stated that she was slow to share with law enforcement the full truth about the murder because she feared "what people would think and what [her] daughters would think." *Id.* at 1049. She did not want her daughters to "look badly" on her because she took part in the murder. *Id.*

{¶ 175} "[I]t is within the province of the jury to consider the inconsistencies in [a witness's] previous statements to police with the testimony [the witness] provide[s] at trial and resolve them accordingly." *State v. Hart*, 10th Dist. No. 17AP-659, 2018-Ohio-2907, ¶ 22; *accord State v. Steward*, 10th Dist. No. 19AP-28, 2020-Ohio-4553, ¶ 75, quoting *State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 72 (" 'It is the province of the factfinder to determine the truth from conflicting evidence, whether the conflicting evidence comes from different witnesses or is contained within the same witness's

testimony.' "). Although Bledsoe and White admitted they initially lied to the police, a jury could reasonably determine that they provided believable excuses for lying and accept their subsequent testimony.

{¶ 176} Second, Elliott argues that Bledsoe and White are not credible because they have prior convictions and faced charges related to Best's murder. Bledsoe testified that he previously pleaded guilty to attempted theft, a fifth-degree felony, in 2016. However, Bledsoe did not face charges related to Best's murder. Although he initially testified the state would have pursued charges against him if he had not testified against Elliott, he clarified on redirect examination that, in fact, he had only faced arrest if he had not complied with the subpoena to testify at trial.

{¶ 177} Unlike Bledsoe, White was charged with multiple offenses related to Best's murder. White agreed to enter a guilty plea to Count 1, aggravated burglary; Count 2, kidnapping; a lesser-included offense of Count 6, involuntary manslaughter; and Count 7, tampering with evidence. The state of Ohio agreed to recommend the trial court enter a nolle prosequi for Count 3, aggravated murder; Count 4, aggravated murder; and Count 5, murder. The state also agreed to recommend the trial court sentence White to an indefinite sentence of 20 to 25.5 years imprisonment.

{¶ 178} In the plea agreement, White also agreed to plead guilty in a separate case to one count of possession of fentanyl, a fifth-degree felony. The state agreed to recommend that the trial court terminate the case for time already served, which exceeded the maximum sentence for the offense.

{¶ 179} On direct examination, White admitted that the plea agreement was "a good thing" for her, but to obtain its benefits she had to "[t]ell the truth" at Elliott's trial. (June 21, 2022 Tr. Vol. VII at 1060.) Elliott's trial counsel ensured that the jury understood that White accepted the plea agreement, at least in part, so she could negotiate a lesser sentence than she would receive if convicted. On cross-examination, White answered as follows:

> Q: You had decided that the only way that you could get out is to enter a plea, right?
>
> A: Yes.

Q: And that was the primary thing you talked about. You didn't talk about feeling guilty. You ain't talk about anything other than the only way I'm going to see the light of day is if I can somehow manage to enter a plea with the State of Ohio; is that correct?

A: Yes.

Q: Who decides whether you get this deal or not?

A: State of Ohio.

Q: The State of Ohio. They decide whether you're telling the truth or you're being honest; is that correct?

A: Yes.

*Id.* at 1130-31.

{¶ 180} Given White's potential motive to dissemble, the trial court instructed the jury on how to weigh White's testimony:

You've heard testimony from Nicole White[,] another person who pled guilty to aggravated burglary, kidnapping, involuntary manslaughter, and tampering with evidence in the case and is said to be an accomplice. An accomplice is one who purposely or knowingly assists another in the commission of a crime. Whether Nicole White was an accomplice and the weight to give her testimony are matters for you to determine from all the facts and circumstances in evidence.

The testimony of an accomplice does not become inadmissible because of her complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect her credibility and make her testimony subject to grave suspicion, and require that it to be weighed with great caution.

It is for you, as jurors, in light of all the facts presented to you and from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

(June 23, 2022 Tr. Vol. IX at 1435-36.)

{¶ 181} It is within the jury's province to believe a co-defendant's testimony despite her admitted involvement in the offenses and plea agreement with the state. *State v. Webster*, 10th Dist. No. 20AP-171, 2021-Ohio-3218, ¶ 74; *State v. Brightwell*, 10th Dist. No.

18AP-243, 2019-Ohio-1009, ¶ 42-44; *Hart*, 2018-Ohio-2907, at ¶ 21; *State v. Berry*, 10th Dist. No. 10AP-1187, 2011-Ohio-6452, ¶ 18; *accord State v. Williams*, 8th Dist. No. 111922, 2023-Ohio-2296, ¶ 93 (holding a co-defendant's "testimony was not 'unworthy of belief' simply because of his involvement in the robberies and his plea agreement with the state"). Likewise, a jury may find a witness's testimony credible despite his previous convictions. *Greenwood*, 2021-Ohio-921, at ¶ 37, 41; *State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, ¶ 37.

{¶ 182} The jury in this case had before it sufficient evidence to understand that the plea agreement could possibly influence White to falsely implicate Elliott in Best's murder. The jury also heard the trial court's instruction warning it to carefully consider White's credibility in light of her admitted participation in the crimes. Additionally, the jury understood that Bledsoe had a previous conviction, which might cast doubt on his truthfulness. Despite the reasons to disbelieve Bledsoe and White, the jury found both witnesses credible.

{¶ 183} Third, Elliott argues that Bledsoe and White are not credible because both were intoxicated when Best was murdered. White testified that at the time of the murder, Bledsoe was drunk, and she was high on crystal methamphetamine. White, however, maintained that the drugs she took did not affect her ability to remember. According to White, "[t]he next day after doing drugs [she] always replay[ed] [events] * * * like a movie [in her head]." (June 21, 2022 Tr. Vol. VII at 1102.)

{¶ 184} For the purposes of a manifest weight of the evidence review, a witness's intoxication " 'is not a sufficient basis to completely undermine his or her testimony absent something in the record demonstrating that the intoxication rendered the witness incapable of accurately recalling the events.' " *State v. Harrison*, 1st Dist. No. C-220171, 2023-Ohio-471, ¶ 13, quoting *State v. Melton*, 8th Dist. No. 103341, 2016-Ohio-1227, ¶ 7. Here, both Bledsoe and White testified to their recall the events of Best's murder. Consequently, Bledsoe's and White's intoxication is only a factor informing the credibility determination; it does not render their testimony per se incredible. *See Melton* at ¶ 7 (absent evidence that intoxication rendered a witness unable to accurately recall events, "[i]ntoxication bears on the witness['s] credibility, but the weight of the testimony must still

be considered by the trier of fact with the ability to view and hear firsthand the witness['s] testimony").

{¶ 185}  Fourth, Elliott argues that Bledsoe and White are not credible because they had their own motive to murder Best:  they wanted to have a relationship, but Best—Bledsoe's girlfriend—stood in the way.  The evidence supporting Bledsoe's and White's supposed motive is weak, at best.  Bledsoe testified that he and White liked each other "[a] little bit." (June 16, 2022 Tr. Vol. VI at 916.)  He and White kissed each other once, although Best knew about the kiss.  According to Bledsoe, he would "probably" consider having White as a girlfriend if he was not in a relationship with Best.  *Id.* at 917.  White, however, denied wanting to date Bledsoe.  She also denied ever kissing Bledsoe.  White explained that she lacked any interest in Bledsoe because she is attracted to the same sex.

{¶ 186}  After reviewing each of Elliott's challenges to Bledsoe's and White's credibility, we cannot say the jury clearly lost its way.  The jury was in the best position to assess the credibility of the witnesses and their testimony.  During cross-examination of Bledsoe and White, defense counsel explored the various reasons the jury could find both witnesses unreliable and reject their version of events.  The jury, therefore, was aware of all the credibility issues Elliott raises on appeal, and it could evaluate the witnesses' testimony in light of those issues.  The jury found Bledsoe and White were believable witnesses.  Nothing Elliott argues on appeal makes Bledsoe's and White's testimony so incredible as to render Elliott's convictions against the manifest weight of the evidence.

### 4.  Manifest Weight–Lack of Physical Evidence

{¶ 187}  Elliott next argues that his convictions are against the manifest weight of the evidence due to the lack of physical evidence connecting him to Best's murder.  Contrary to Elliott's argument, the record is not devoid of physical evidence corroborating Elliott's participation in Best's murder.  Tracy, Bledsoe, and White all testified that Elliott wore plastic gloves when assaulting Best.  The police found a plastic glove in a trash can in the backyard of 1422 Phale D. Hale Drive.  The state presented evidence that DNA analysis of a swab from the outside of that glove detected a DNA mixture consistent with Best and Elliott.

{¶ 188}  Moreover, a conviction based on testimony is not against the manifest weight of the evidence despite the lack of physical evidence.  *State v. Steward*, 10th Dist.

No. 19AP-35, 2019-Ohio-5258, ¶ 31. In other words, " '[i]f testimony is believed[,] then the lack of fingerprints, DNA, footprints or any other physical evidence does not render the conviction against the manifest weight of the evidence.' " *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21, quoting *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16.

**{¶ 189}** Here, the testimony of Tracy, Bledsoe, and White provides the evidence necessary to find Elliott guilty beyond a reasonable doubt of aggravated murder, aggravated burglary, kidnapping, and tampering with evidence. Therefore, the paucity of physical evidence does not render Elliott's convictions against the manifest weight of the evidence.

### 5. Manifest Weight–Testimony of Gee

**{¶ 190}** Finally, Elliott argues that his convictions are against the manifest weight of the evidence because the black man that Kari Gee, the OSU Hospital employee, saw walking between apartments B and C was wearing clothing that did not match Elliott's clothing. Gee testified that the black male she saw was wearing coveralls and possibly a black beanie. The recording from Officer Wolfe's body-worn camera shows that, only hours before Best's murder, Elliott was wearing a light-colored t-shirt, blue jeans, and a black ballcap.

**{¶ 191}** Based on Bledsoe's and White's testimony, Elliott was the only person Gee could have observed walking between apartments B and C at 4:30 a.m. on March 13. As neither Tracy, Bledsoe, nor White testified that Elliott had changed his clothes prior to that time, it appears Elliott was then wearing a t-shirt and jeans, not coveralls. Thus, Elliott has identified an inconsistency in the evidence. While a jury may take note of inconsistencies in the evidence and resolve or discount them, inconsistencies do not render a defendant's conviction against the manifest weight of the evidence. *State v. Walker*, 10th Dist. No. 20AP-138, 2021-Ohio-1381, ¶ 21; *State v. Johnston*, 10th Dist. No. 18AP-817, 2019-Ohio-5135, ¶ 20. Consequently, Gee's testimony regarding the apparel of the man she saw does not provide a basis for a reversal of Elliott's convictions on manifest weight grounds.

**{¶ 192}** In sum, we conclude that Elliott's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Accordingly, we overrule Elliott's sixth assignment of error.

### G. Seventh Assignment of Error—Appointment of New Counsel

{¶ 193} By Elliott's seventh assignment of error, he argues that the trial court erred in not inquiring further when he requested new appointed counsel. We disagree.

{¶ 194} Under the Sixth Amendment to the United States Constitution, an indigent defendant is entitled to professionally competent, effective representation. *State v. McNeill*, 83 Ohio St.3d 438, 452 (1998). However, "[t]here is no constitutional right to a 'meaningful attorney-client relationship.' " *Id.*, quoting *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983).

{¶ 195} "To discharge a court-appointed attorney, the defendant must show a breakdown in the attorney-client relationship of such a magnitude as to jeopardize the defendant's right to effective assistance of counsel." *State v. Coleman*, 37 Ohio St.3d 286 (1988), paragraph four of the syllabus. Disagreement between a court-appointed attorney and a client over trial tactics and strategy does not warrant a substitution of counsel. *State v. Erwin*, 10th Dist. No. 09AP-918, 2010-Ohio-3022, ¶ 7; *State v. Harris*, 10th Dist. No. 09AP-1111, 2010-Ohio-4127, ¶ 41. Similarly, hostility, tension, and personal conflicts do not require appointment of new counsel if they do not result in a total breakdown in communication that interferes with the preparation and presentation of a defense. *Erwin* at ¶ 7; *Harris* at ¶ 41. To obtain a new appointed counsel, a defendant " ' "must demonstrate 'good cause' to warrant substitution of counsel." ' " *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 149, quoting *State v. Cowans*, 87 Ohio St.3d 68, 99 (1999), quoting *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir.1990). Such good cause includes a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict that leads to an apparent unjust result. *Erwin* at ¶ 7; *Harris* at ¶ 41. Importantly, good cause for the dismissal of court-appointed counsel is not determined solely according to the subjective standard of what the defendant perceives. *State v. Evans*, 153 Ohio App.3d 226, 2003-Ohio-3475, ¶ 31 (7th Dist.).

{¶ 196} A defendant bears the burden of demonstrating grounds for the appointment of new counsel. *State v. Griffin*, 10th Dist. No. 12AP-798, 2013-Ohio-5389, ¶ 12; *Erwin* at ¶ 8; *Harris* at ¶ 42. If a defendant alleges facts which, if true, would warrant the appointment of new counsel, the trial court must inquire into the defendant's complaint and make that inquiry on the record. *Griffin* at ¶ 12; *Erwin* at ¶ 8; *Harris* at ¶ 42. However,

the " 'limited judicial duty [to inquire into a defendant's complaint] arises only if the allegations are sufficiently specific; vague or general objections do not trigger the duty to investigate further.' " *Johnson*, 2006-Ohio-6404, at ¶ 68, quoting *State v. Carter*, 128 Ohio App.3d 419, 423 (4th Dist.1998).

{¶ 197} On September 29, 2020 and November 30, 2020, the trial court received almost identical letters from Elliott in which he complained about his court-appointed attorney. Elliott told the court that he wanted to fire his attorney because he had only briefly spoken with his attorney twice, and he had not yet received his discovery responses. Elliott stated that he felt his attorney did "not have [his] best interest in mind," and he "did not feel [he was] getting the proper representation [he was] entitled by law."

{¶ 198} As an initial matter, we conclude that Elliott only expressed general dissatisfaction with his attorney when he complained that his attorney did not have his best interest in mind and was not providing him proper representation. Such complaints do not warrant further investigation. *See State v. Phipps*, 2d Dist. No. 29199, 2022-Ohio-1188, ¶ 17-18 (no duty to inquire further where the defendant requested to fire his court-appointed attorney because he complained his attorney had not fully represented him); *Griffin* at ¶ 13, quoting *State v. Washington*, 1st Dist. No. C-000754 2001 Ohio App. LEXIS 3604, *14 (Aug. 17, 2001) (" 'A trial court, without more, does not abuse its discretion in finding that a general allegation of unhappiness with appointed counsel is so vague that it does not require additional investigation.").

{¶ 199} Although Elliott's other allegations in his letters are more specific, they do not rise to the level of good cause. Elliott did not assert a complete breakdown in communication; instead, he merely wanted more contact with his attorney. Moreover, we are mindful of the context in which Elliott wrote his letters. Elliott was indicted on April 17, 2020. His trial did not begin until over two years later, on June 8, 2022. Elliott, consequently, complained about his counsel's performance relatively early in the evolution of his case. In that context, his letters do not show a breakdown in the attorney-client relationship that required court inquiry, but rather betray frustration with the pace of litigating a complicated aggravated murder case. Indeed, when the case proceeded to trial, Elliott did not express to the trial court that he was dissatisfied with his attorney.

{¶ 200} Considering the totality of the circumstances, Elliott's complaints regarding his court-appointed counsel did not trigger the trial court's duty to conduct an inquiry. Accordingly, we overrule Elliott's seventh assignment of error.

## IV. CONCLUSION

{¶ 201} For the foregoing reasons, we overrule Elliott's seven assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON and EDELSTEIN, JJ., concur.

_____

JAMISON, J., concurring.

{¶ 202} Because the concurrence raises the test for admissibility in *State v. Souel*, 53 Ohio St.2d 123 (1979) and its progeny, I write separately.

{¶ 203} I take no issue with the recitation of facts, therefore, I adopt them fully. Further, I agree with the majority decision's analysis of the second assignment of error. I would also find a different reason to restrict the use of the codefendant's polygraph.

{¶ 204} A defendant's right to present relevant evidence is subject to reasonable restrictions to accommodate other legitimate interests in the criminal trial process. *See, e.g.*, *Rock v. Arkansas*, 483 U.S. 44, 55 (1987). Here, the jury heard all the relevant details of the charged offense from the perspective of the accused, and the exclusion of the codefendant's polygraph results by expert testimony did not preclude him from introducing any factual evidence.

{¶ 205} Unlike the concurring decision of Judge Edelstein, I see no reason for the Supreme Court of Ohio to provide guidance as *Souel* is interpreted correctly. I would find that appellant has no right to admit a polygraph of a separate defendant into evidence in his or her trial. The Fifth Amendment to the United States Constitution, which applies to the States by virtue of the Fourteenth Amendment, provides that " '[*n*]*o person* . . . shall be compelled in any criminal case to be a witness against himself.' " (Emphasis added.) *Malloy v. Hogan*, 378 U.S. 1, 15 (1964), fn. 1. The codefendant took the polygraph for her benefit to potentially use it as a bargaining tool while negotiating a plea bargain or proffer against her codefendant. The rationale they would take her polygraph test and use it in her codefendant's trial would undermine the binding contract between the prosecutor and

defendant. Any statement differing from her polygraph results could incriminate her in the crime of perjury and admissibility, therefore, flies in the face of the protections guaranteed by the Fifth Amendment.

{¶ 206} Further, *Souel* and its progeny go toward admissibility. "A courtroom is not a research laboratory. The fate of a defendant * * * should not hang on his ability to successfully rebut scientific evidence which bears an 'aura of special reliability and trustworthiness,' although, in reality the witness is testifying on the basis of an unproved hypothesis * * * which has yet to gain general acceptance in its field." *United States v. Brown*, 557 F.2d 541, 556 (1977), quoting *United States v. Amaral*, 488 F.2d 1148, 1152 (1973). First, federal and state courts—including this court—have long expressed skepticism of polygraph evidence. *See, e.g.*, *In re D.S.*, 111 Ohio St.3d 361, 2006-Ohio-5851, ¶ 13 ("We have not adopted the unrestrained use of polygraph results at trial, and polygraphs themselves remain controversial."); *Wolfel v. Holbrook*, 823 F.2d 970, 974 (6th Cir.1987) (noting the "general skepticism that pervades the scientific community concerning the reliability of polygraph examination"). As the United States Supreme Court has acknowledged, "doubts and uncertainties plague even the best polygraph exams." *United States v. Scheffer*, 523 U.S. 303, 312 (1998). Such examinations may not be reliable. *See id.* ("Whatever their approach, state and federal courts continue to express doubt about whether such evidence is reliable."). They may also cause unfair prejudice. *See, e.g.*, *State v. Porter*, 241 Conn. 57, 93 (1997) ("After reviewing the case law and the current, extensive literature on the polygraph test, * * * we are convinced that the prejudicial impact of polygraph evidence greatly exceeds its probative value."). *See State v. Nitso*, 11th Dist. No. 2023-T-0025, 2024-Ohio-790. I would find that due to the unreliability of polygraph evidence that the refusal to admit the codefendant's polygraph evidence, exclusive of *Souel*, was not an abuse of discretion.

{¶ 207} The rules of discovery have been liberally construed to provide a defendant with "[a]ny written or recorded statement by * * * a co-defendant" upon demand for discovery. Crim.R. 16(B)(1). However, providing a codefendant with the codefendant's statement does not guaranty admissibility during a trial. Providing the codefendant with the statement gives the defendant the opportunity to impeach the credibility of the witness' testimony if they offer testimony that is inconsistent to the prior statement. Also, evidence

is material—or prejudicial—" ' "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." ' " *State v. Brown*, 174 Ohio St.3d 455, 2024-Ohio-749, quoting *Turner v. United States*, 582 U.S. 313, 324 (2017), quoting *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). The codefendant's polygraph results and statements made therein were disclosed. The jury, the trier of fact, judged the credibility of the witnesses at trial and made a determination as to appellant's guilt or innocence. In a few reported cases prosecutors have gone beyond stipulating to the admissibility of test results and have agreed to the dismissal of charges on the condition that the defendant pass a polygraph examination. *See generally* Annotation, 36 A.L.R.3d 1280 (1971). In some cases, the defendant had no obligations under such an agreement other than to cooperate in the examination. *People v. Reagan*, 395 Mich. 306, 309 (1975); *State v. Sanchell*, 191 Neb. 505, 509-10 (1974), *cert. denied*, 420 U.S. 909, 1975 U.S. LEXIS 461 (Jan. 27, 1975). In other cases the defendant either agreed to admit the test results, *Butler v. State*, 228 So.2d 421, 424-25 (Fla.App.1969), or to enter a plea to a reduced charge in the event he failed the examination, *State v. Davis*, 188 So.2d 24, 27 (Fla.App.1966). Giannelli, Paul C., *Polygraph and Deception Tests: Part II* (1985), Faculty Publications, 471.

{¶ 208} A determinative factor in the reported cases has been the existence of a statute requiring court approval for dismissals. When a trial court approved the dismissal or was cognizant of the agreement, appellate courts have held the prosecutor bound by the agreement on public policy grounds. *Butler* at 424; *Davis* at 28; *People* at 318. According to these courts, the agreement represents a "pledge of public faith - a promise made by state officials - and one that should not be lightly disregarded." *Davis* at 27.

{¶ 209} *Souel* states in relevant portion:

> The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

*Souel* at syllabus. It is axiomatic that no defendant enters into a contract with the prosecutor on the premise that a third-party codefendant who has not negotiated the terms of the agreement, knowingly signed the agreement, or bargained for his own consideration, will receive the consideration in the agreement, the admissibility of the test for their own

benefit. Basic principles of contract require knowing and voluntary agreement, negotiation of its terms, and consideration. As a stipulation is a contract, the codefendant and prosecutor in this case never negotiated terms for appellant. Further, admissibility is still subject to the discretion of the trial judge which in this case was denied.

{¶ 210} Because of the unreliability of the science and the failure to satisfy the first prong of *Souel's* four-part test, I concur with the majority decision to overrule Elliott's second assignment of error.

---

EDELSTEIN, J., concurring.

{¶ 211} While I have the same concerns as Judge Jamison regarding the reliability of polygraph examination results generally, that issue is not before us in this case. I write separately as to the second assignment of error to address the propriety of applying the *State v. Souel*, 53 Ohio St.2d 123 (1978) test to factual circumstances like those presented here.

{¶ 212} The majority resolves the issue of whether the results of a stipulated polygraph examination taken by a codefendant turned cooperating state witness were admissible on cross-examination of the codefendant in Elliott's trial by applying the four-part test set forth in *Souel*. In *Souel*, as noted by the majority, the Supreme Court was tasked with determining whether a defendant's *own* polygraph results could be admitted as evidence in his *own* trial. *Id*. at 129. More precisely, the certified question before the *Souel* court was "[w]hether the results of a polygraph examination are admissible into evidence when the defendant, prior to the examination, consents by written stipulation to the admissibility thereof, but withdraws his consent after the results of the test are known but prior to introduction of the testimony at trial." *Id*. Because of that framing, the *Souel* decision and the first prong of its four-part test reflect the circumstances of that case— namely, that "[t]he prosecuting attorney, defendant and his counsel must sign a written stipulation providing for *defendant's* submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state." (Emphasis added.) *Id*. at syllabus.

{¶ 213}  Here, the majority overrules Ellott's second assignment of error because he cannot satisfy the first prong of *Souel*'s four-part test.  Indeed, it is clear Elliott was not— nor would he ever be—a party to his codefendant's stipulated agreement with the state to the admissibility of that codefendant's polygraph examination results at that codefendant's trial.  For this reason, I question the propriety of our continued application of a patently unworkable test to circumstances like those presented in this case.  Elliott sought to cross-examine and impeach his codefendant, White, who testified as a state's witness in his trial.  In her own case, White and the state entered a stipulation whereby they agreed the results of White's polygraph examination would be admissible as evidence in her trial.  Of course, Elliott was not a party to that stipulation, and White did not agree to undergo an additional polygraph examination under stipulation with Elliott and the state.  Suffice it to say, these circumstances are meaningfully different from those encountered by the court in *Souel.*

{¶ 214}  Despite these differences, appellate courts across the state, including our own, have suggested the *Souel* test applies when deciding the admissibility of *all* polygraph examinations.  *See, e.g., State v. Rowe*, 68 Ohio App.3d 595, 610 (10th Dist.1990) (noting the *Souel* factors must be satisfied before a witness's polygraph examination results can be admitted into evidence at a criminal trial); *State v. Penque*, 8th Dist. No. 99209, 2013-Ohio-4696, ¶ 33-35 (applying the *Souel* requirements to admissibility of a witness's failed polygraph test); *State v. Rucker*, 6th Dist. No. S-99-007, 2000 Ohio App. LEXIS 3819, *7-8 (Aug. 25, 2000) (applying the *Souel* test to admissibility of stipulated polygraph examinations taken by the appellant and a witness).

{¶ 215}  On close review of *Souel* and its progeny, however, I do not find any mandate requiring that a defendant who seeks to use evidence of a codefendant's polygraph examination results at his own trial be a party to the codefendant's written stipulation with the state regarding the admissibility of that codefendant's polygraph results at that codefendant's trial.  In fact, this court seemed to acknowledge as much in *State v. Lascola*, 61 Ohio App.3d 228, 234 (10th Dist.1988), when we stated, "[T]he guidelines of *Souel* specifically addressed the admissibility of a defendant's polygraph test results, not those of the complaining witness."  So, too, did the Seventh District, when it noted that " 'appellate courts have not specifically ruled that a witness's polygraph test is admissible under the same conditions as a defendant's polygraph test.' " *State v. Beshara*, 7th Dist. No. 07 MA

37, 2009-Ohio-6529, ¶ 65, quoting *State v. Hubbard*, 150 Ohio App.3d 623, 2002-Ohio-6904, ¶ 39 (7th Dist.), citing *Lascola* at 236.

{¶ 216} And so, our court and many of our sister districts have continued to extrapolate from the *Souel* decision in circumstances like those presented here without explicit guidance from our Supreme Court. Indeed, that is how the majority resolves Elliott's second assignment of error today. But, in a case like this, requiring that a defendant be party to a codefendant witness's stipulated polygraph examination is unnecessary and impracticable. Instead, it seems the procedures and safeguards in this case alleviate the primary fairness and reliability concerns that gave rise to the *Souel* requirements. White, her counsel, and the state entered a polygraph stipulation and agreed the results of her examination would be admissible in her trial. By their stipulation, White and the state assumed the risk of error and exercised control over the procedures and other variables that affect the accuracy of polygraph examination results. *See Souel* at 133, citing *Note*, 48 N.Y.U.L.Rev. 339 (1973); *Lascola* at 234. Although Elliott was not party to this stipulation, he sought to admit the polygraph evidence in his own trial, seemingly accepting its questionable reliability, risk of error, and possible ramifications of its presentation as evidence to the jury. And given Crim.R. 16(B)(1)'s requirement that the state provide a defendant with "[a]ny written or recorded statement by * * * a co-defendant" upon discovery demand and a criminal defendant's federal and state constitutional rights to confront witnesses testifying against him at trial, it is difficult to reconcile these well-established rights and rules with case law categorically precluding, pursuant to *Souel*, a defendant from questioning a codefendant testifying against him on behalf of the state about prior statements—including those made during polygraph examination—that call into question the credibility of that testimony.

{¶ 217} I therefore write separately to emphasize the need for clarification from the Supreme Court on when a testifying codefendant witness's stipulated polygraph examination results may be admitted into evidence at a defendant's criminal trial. As Justices Brunner and Donnelly recently noted in opinions dissenting from the court's denial of jurisdiction in *State v. Nitso*, ___ Ohio St.3d ___, 2024-Ohio-2885, significant uncertainty remains regarding the admissibility of polygraph examination results

notwithstanding the fact that *Souel* was decided over 45 years ago.  The bench, the bar, and criminal defendants would benefit from some clarification.

———————————